532 A.2d 385

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Willie CLAYTON, Appellant.**

Supreme Court of Pennsylvania.

Argued Jan. 28, 1987.

Decided Oct. 15, 1987.

Samuel C. Stretton, West Chester, for appellant.

Ronald Eisenberg, Chief, Appeals Div., Gaele McLaughlin Barthold, Deputy Dist. Atty., Marianne Cox, Philadelphia, Marion E. MacIntyre, Deputy Atty. Gen., Harrisburg, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA, and PAPADAKOS, JJ.

## OPINION OF THE COURT

HUTCHINSON, Justice.

▆▆▆ Willie Clayton directly appeals as of right[1] two death sentences imposed by Philadelphia Common Pleas. Along with his two convictions of first degree murder, appellant was convicted of two counts of robbery and two counts of possession of an instrument of crime. On appeal before this Court, he raises four issues that require full review. First, he contends that the admission of two bul-

---

1. 42 Pa.C.S. § 9711(h)(1).

lets and ballistics testimony, without at least a cautionary instruction, was reversible error because the Commonwealth could not show which of the two bullets was fired by appellant. Secondly, he argues that the trial court erred in consolidating the two murder trials. In the third instance, he asserts that his due process rights were violated because the trial court refused to grant a continuance to permit his mother and stepfather to testify at the penalty phase of his trial. Finally, he claims he is entitled to a new trial because the prosecutor made a prejudicial statement to the jury.[2]

2. Appellant raises four other issues as well. They are:

(A) His right to a fair trial was denied when Lt. Shelton, the police officer who investigated the murders, stated that he worked for a special unit that "is basically a career criminal type unit within the Homicide Division." N.T. at 5.23. Appellant alleges that this implied he was a career criminal.

(B) His due process rights were violated because he was not charged with one of the two murders (Summers) until 1984, even though it had taken place on July 30, 1980. Appellant argues that the police department deliberately delayed bringing charges for tactical reasons.

(C) The trial court abused its discretion in dismissing a juror that had already been accepted by both sides, even though the trial had not yet started. Appellant contends that the trial court's refusal to bring the juror back into court and allow defense counsel to question her directly was reversible error.

(D) Excessive delays experienced in this jurisdiction in carrying out a penalty of death rise to cruel and unusual punishment.

All of these arguments are without merit. As to (A), we fail to see how this statement prejudiced appellant. There was no direct statement that appellant was a career criminal, and it is reasonable to assume that an officer who investigates several murders committed under similar circumstances would be assigned to a career criminal unit. *See Commonwealth v. Carpenter*, 511 Pa. 429, 515 A.2d 531 (1986).

Argument (B) fails under *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977), because appellant must show that the delay was a deliberate tactical move in bad faith by the Commonwealth and that he was prejudiced by it in order to establish a denial of due process. Appellant has failed to produce any evidence that the delay was a tactical move made in bad faith on the part of the Commonwealth. Furthermore, the record shows that Lt. Shelton delayed because he had no earlier evidence to place appellant at the scene of the crime.

There is no merit to argument (C). The trial court acted within its discretion in dismissing the juror who was unable to find someone to care for her four year old child. The court, therefore, found undue hardship pursuant to 42 Pa.C.S. § 4503(a)(3). The trial court provid-

Based on these reasons, appellant concludes that a new trial should be granted.

Upon careful review, we disagree for the reasons set out below. Furthermore, as required by statute, we have made an independent review of the record for sufficiency and proportionality to ensure against arbitrary imposition of the death penalty.[3] For that purpose, we have secured and examined the statistical data collected by the Administrative Office of Pennsylvania Courts and determined that the penalty imposed is proportional to that imposed in other cases.[4]

Because of the nature of the arguments raised by appellant, an initial examination of the facts and procedural history of this case is helpful. The relevant events took place between May 26 and September 14, 1980.

On the evening of May 26, 1980, Earl Grice was found dead in his apartment above the Quill and Scroll Bar he had owned in Center City, Philadelphia. Grice was found lying on the couch. He had died as a result of a hard contact

ed counsel an opportunity to question the juror over the phone, and this discussion was recorded by the stenographer. This provided a sufficient opportunity for defense counsel to question her. *See Commonwealth v. Pasco*, 332 Pa. 439, 2 A.2d 736 (1938).

As to (D), reasonable delay in carrying out the sentence is necessary to ensure that no person is unjustifiably executed. This necessity is embodied in our sentencing statute, 42 Pa.C.S. § 9711(h), which requires this Court not only to examine issues raised by appellant, but also to make an independent review of the record. In this case, the initial delay has been little more than a year. In other cases, the delay is compounded by condemned prisoners exercising their rights to collateral review in both state and federal courts.

3. 42 Pa.C.S. § 9711(h)(3). *See Commonwealth v. Holcomb*, 508 Pa. 425, 498 A.2d 833 (1985) (Hutchinson, J., Opinion Announcing the Judgment of the Court), *cert. denied*, 475 U.S. 1150, 106 S.Ct. 1804, 90 L.Ed.2d 349 (1986); *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983).

4. Sentencing juries in eight other cases besides appellant's have similarly found two aggravating and no mitigating circumstances. In seven of those eight cases, a sentence of death was imposed. *See Commonwealth v. Frey*, 504 Pa. 428, 475 A.2d 700 (1984).

gunshot wound to the head.[5] The bullet had come from a .38 caliber gun. Ballistics tests could not identify the particular gun that fired the distorted bullet removed from Grice's head. Grice's pants pockets had been ripped out and an empty cash box was found open on the bedroom floor with receipts tossed about. A pillow with gunshot residue was also found in the apartment. Apparently, it had been used to muzzle the noise of the shot.

Evidence produced at trial showed that Grice was a known drug dealer. Evidence also showed that appellant went to see Grice at his bar on the evening of May 26, 1980, and at about 7:30 p.m. both went upstairs into Grice's apartment. Grice had been seen flashing around a large roll of money earlier that evening.

On July 30, 1980, Jack Summers was found in his apartment above the Graduate Bar, a few blocks from the Quill and Scroll. Summers had died as a result of a gunshot wound to the head fired at close range. The bullet was from a .38 caliber gun, and could have been from the same gun which killed Grice. Both of Summer's pockets had been pulled inside out.

At trial, it was shown that appellant had frequently visited Summers at his apartment. Summers was a known drug dealer.

On August 26, 1980, the body of Terrance Dougherty was found lying face down on the floor of his bedroom with a pillow over his head. Dougherty had also died from a hard contact shot to the head from the same gun that had killed Summers. This murder was in the same general area as the other two.

An earlier trial had revealed that Dougherty was also a known drug dealer, and that appellant knew him.[6]

5. A hard contact gunshot wound occurs when the front portion of the gun is pressing against the skin when the bullet is fired.

6. No evidence of the Dougherty murder was admitted at the present trial. The facts of this crime are added for purposes of clarity since one of the arguments raised by appellant relies on our decision in *Commonwealth v. Clayton,* 506 Pa. 24, 483 A.2d 1345 (1984) (plurality

On September 14, 1980, according to the testimony of Thomas Felder, appellant and an unidentified man came to Felder's apartment ostensibly to buy cocaine. Felder stated that he was not selling drugs at that time, but offered to put them in contact with someone who could. They left Felder's apartment to go to a phone booth. After the call was made, appellant accompanied Felder back to his apartment saying that he had left something behind. Appellant came out of Felder's bathroom carrying a .38 caliber gun and forced Felder to lie down on the bed. He took money from Felder's pants pockets and a gold chain from his neck. He and his companion then bound Felder's arms and hands. Appellant placed a pillow over his head. He put the gun to the pillow and fired. It did not go off. He fired again. This time he shot Felder in the back. Felder held his breath, pretended that he was dead, and waited for appellant to leave.

When appellant shot him in the back, Felder was already carrying a bullet in the stomach at the hands of a Wendell Lewis. At the hospital he had both bullets removed. Through a mix-up no one identified which of the two bullets had been removed from the back. Ballistics experts were able to show that one of the two bullets was fired from the same gun that had killed Summers and Dougherty and could have killed Grice.

Appellant was originally tried and acquitted for the murder of Terrance Dougherty. Before that trial was completed, appellant was also charged with the Grice murder. At a jury trial for that crime in March 1982, appellant was convicted of first degree murder, robbery, and possession of

opinion). In that case appellant was charged with the murder of Grice, and the circumstances of the Dougherty murder were admitted at trial under a common plan, scheme or design theory. We reversed. In an opinion announcing the judgment of the Court, Mr. Justice Zappala reasoned that the similarity between the two murders was insufficient to satisfy the requirements of the common scheme exception to the general rule prohibiting the admission of evidence of past criminal conduct. Appellant's reliance on our decision in that case in arguing here against the consolidation of the Grice and Summers murder charges requires reference to the killing of Dougherty.

an instrument of crime. A sentence of death was imposed along with ten to twenty years for the robbery charge and two and one-half years for the weapons offense. On direct appeal to this Court, we overturned the conviction and remanded for a new trial. *Commonwealth v. Clayton,* 506 Pa. 24, 483 A.2d 1345 (1984).

At the first Grice trial, Roy Young, a cellmate, testified that appellant told him he had killed both Grice and Summers so that people would fear him, and he could so increase his influence over the drug traffic in Center City Philadelphia.

On this and other evidence discovered by police, the Commonwealth had charged appellant with both the Grice and Summers murders. After our remand in Grice, these charges were consolidated for trial. In it, a jury found appellant guilty of two counts of murder in the first degree, two counts of robbery and two counts of possession of an instrument of crime. After a penalty hearing, appellant received two death sentences. Post trial motions were denied, and appellant was formally sentenced on February 25, 1986, for the crimes involving Grice and Summers. In addition to the two death sentences, appellant received two consecutive sentences of ten to twenty years for robbing Grice and Summers. A motion to modify and reconsider sentence was denied and this direct appeal taken to us on March 4, 1986.

I

Appellant challenges the admissibility of the bullets removed from Thomas Felder, and the testimony of a ballistics expert that one of the bullets removed from Felder was fired from the same gun that killed Summers, and could have been fired from the same gun that killed Grice. In the alternative, appellant argues that even if this evidence was admissible, the trial court erred by not instructing the jury that inferences they find which are equally likely from the evidence must be drawn in favor of the defendant. As a matter of abstract deductive logic, appellant's argument

initially seems correct. Concretely, however, it requires inductive consideration of both the factual circumstances surrounding the removal of the bullets from Felder's body and the other relevant evidence produced at trial. We will so consider it.

Felder testified that he was shot twice. In an unrelated earlier incident, Wendell Lewis had shot him in the stomach. On September 14, 1980, appellant shot him in the back. These two bullets were surgically removed at the same time, but not labeled. Hence, it could not be directly determined which bullet was removed from his back. Appellant argues that the bullets and ballistics testimony should not have been admitted because there was no probability that the bullet taken from Felder's back was fired from the gun which killed Summers, but only a 50–50 possibility, a possibility too speculative to place before a jury. Because the Commonwealth could not directly identify which of the two bullets was removed from Felder's back, appellant goes on to argue that the bullets and ballistics testimony were not relevant. This argument fails. While the inability to conclusively identify which of the bullets came from Felder's back affects the weight of this evidence, it does not affect its admissibility. Independent bits of evidence in a trial are not viewed in splendid isolation, as if the probability factor of each was independent of all others. They are part of a web whose interlocking strands weave a snare for the man who would set upon his fellow in secret and with stealth. The pursuit of truth is inductive more often than deductive and the snare is made out when the strands intertwine on each other warp and woof. Such is the case here. Relevance is not to be confused with deductive certainty, nor considered as if each bit of evidence must independently establish probability. Such treatment confuses the issue of relevancy with the problem of establishing a foundation for admission.

Relevant ballistics testimony and weapons are admissible despite an inability to conclusively determine that the introduced weapon was the actual one used in the crime.

*See, e.g., Commonwealth v. Brown,* 467 Pa. 512, 359 A.2d 393 (1976); *Commonwealth v. Pierce,* 453 Pa. 319, 309 A.2d 371 (1973); *Commonwealth v. Ford,* 451 Pa. 81, 301 A.2d 856 (1973).

In *Commonwealth v. Ford, supra,* the Commonwealth introduced a knife found in the possession of the defendant because it *could have been used* in the murder of the two victims. It could not be said that defendant's knife was the actual weapon used in the commission of both acts. Still, we held it relevant and admissible because it was possessed by the defendant and could have been so used. As long as the proper foundation had been laid, the inability to conclusively establish the knife in evidence was the actual weapon employed in the crime affected its weight, not its admissibility.

■ In the present case, the bullets are admissible. One of the two bullets removed from Felder came from the gun that killed Summers. *Commonwealth v. Stewart,* 461 Pa. 274, 336 A.2d 282 (1975). At issue in this case is whether appellant killed Summers. Felder testified that appellant tried to kill him in the same style that Summers was murdered. As in the *Ford* case, the fact that appellant could have fired the bullet that came from the same gun that killed Summers would make it more probable that appellant shot Summers. Since it was relevant, and the proper foundation was laid, the evidence was admissible. The bullet's foundation flows from the other evidence linking appellant to the Summers killing. This other evidence made it relevant. The jury was aware that the Commonwealth could not establish which bullet was removed from Felder's back, and could weigh the evidence accordingly.

■ Even if admissible, appellant argues that the trial court should have instructed the jury that when two equally and mutually inconsistent inferences can be drawn from the same set of circumstances, the inference must be drawn in favor of the defendant. Relying on our decision in *Commonwealth v. Tribble,* 502 Pa. 619, 467 A.2d 1130 (1983), appellant argues that a fact finder could have inferred with

equal reason that either Mr. Lewis or he fired the bullet in question in this case. This reliance is misplaced. In *Tribble,* we considered *all* of the evidence and determined that two equally conflicting inferences could be inferred. When *all* of the evidence is examined in the present case, it is clear that two equally conflicting inferences *cannot* be inferred.

In *Commonwealth v. Tribble, supra,* the defendant had worked for the Montgomery County Opportunity Board (Board) just two months before a break-in took place on the Board's property. His job required him to come into contact with certain trucks owned by the Board. These trucks were forcibly entered. An investigation revealed several of the defendant's fingerprints. There was no evidence that these trucks had been used frequently by other employees, or how long these fingerprints had been on the truck.

Mr. Justice Larsen, writing for the majority, stated, based on *all* the evidence: "While it is a reasonable inference that [the defendant's] fingerprints were impressed on the [night of the crime], an equally reasonable inference may also be drawn that [the defendant's] fingerprints were impressed prior to the time of the break-in...." *Id.,* 502 Pa. at 622, 467 A.2d at 1131. Mr. Justice Larsen said that if other evidence had been introduced to support the Commonwealth's case, then it would not have been necessary to overturn the conviction.[7] He said for the Court, "there is no evidence that these trucks were used frequently; a fact which, if established, would diminish the possibility that the prints were old." *Id.*

In the present case, if we looked at the admission of the two bullets in isolation, two equally inconsistent inferences could be drawn. However, when *all* of the evidence is

7. *See also Commonwealth v. Hubbard,* 472 Pa. 259, 372 A.2d 687 (1977). A similar argument was raised in *Hubbard* and this Court stated, "[w]hile none of the foregoing facts taken singly would be sufficient to establish [the defendant's] guilt, the totality thereof and the reasonable inferences arising therefrom were legally sufficient to render [the defendant's] guilt an issue for the jury." *Id.,* 472 Pa. at 271, 372 A.2d at 692 (quoting *Commonwealth v. Dawson,* 464 Pa. 254, 257, 346 A.2d 545, 547 (1975)).

276

examined, there is a significant probability that the matching bullet was fired by appellant rather than Lewis. Roy Young testified that appellant confessed to killing Summers and Grice. One of the bullets was fired from the same gun that killed Summers. Lewis shot Felder in the stomach, while appellant attempted to shoot him at close range in the head, the same method used in killing Summers. Thus, when *all* of the evidence is "connected-up" it shows a stronger probability that the relevant bullet was fired by appellant.

## II

■ Appellant next argues that the trial court erred in permitting consolidation of the Grice and Summers murders for trial. He relies on our decision in *Commonwealth v. Clayton*, 506 Pa. 24, 483 A.2d 1345 (1984). There, a plurality reasoned that evidence of the Dougherty murder was evidence of unrelated crime and so inadmissible at appellant's trial for the Grice murder. Appellant now argues that the Summers and Grice murders should not have been consolidated, because it permitted similar evidence on unrelated crimes to get before the same jury. Appellant's reliance on our previous decision is misplaced.[8]

8. Separate crimes may be consolidated for trial as long as evidence admissible at one would be admissible at the other, and the defendant is not unduly prejudiced. Pa.R.Crim.P. 1127A(1)(a), 1128; *Commonwealth v. Galloway*, 495 Pa. 535, 434 A.2d 1220 (1981); *Commonwealth v. Morris*, 493 Pa. 164, 425 A.2d 715 (1981). As a general rule, crimes unrelated to the one charged are not admissible. There are, however, several exceptions to this proposition. In *Commonwealth v. Rose*, 483 Pa. 382, 396 A.2d 1221 (1979), we stated:
 'evidence of other crimes is admissible when it tends to prove (1) motive; (2) intent; (3) absence of mistake or accident; (4) a common scheme, plan or design embracing commission of two or more crimes so related to each other that proof of one tends to prove the others; or (5) to establish the identity of the person charged with the commission of the crime on trial—in other words, where there is such a logical connection between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other. [Citation omitted.] When the evidence is relevant and important to one of these five issues, it is generally conceded that the prejudicial effect may be outweighed by the probative value. [Footnote omitted.] [Emphasis added.]', quot-

In *Commonwealth v. Clayton, supra,* Mr. Justice Zappala in an opinion announcing the judgment of the Court,[9] said that evidence of the Dougherty murder could not be introduced at appellant's first trial for the Grice murder because none of the recognized exceptions stated in *Rose, supra,* applied.

In *Clayton,* the Commonwealth argued from a syllogism. Its major premise was that the circumstances of the Dougherty murder were admissible at a trial for the shooting of Felder because the same gun was used in both. Its minor premise was that the Felder shooting was admissible at the trial for the Grice murder. From this it sought to deduce that evidence of the Dougherty murder was admissible for the Grice murder.

Mr. Justice Zappala reasoned that there was no direct evidence, as in *Rose,* to connect appellant to the Dougherty murder. In fact, appellant had been acquitted of the Dougherty murder. Mr. Justice Zappala noted that the Dougherty connection was completely dependent on the

ing *Commonwealth v. Peterson,* 453 Pa. 187, 197–8, 307 A.2d 264, 269 (1973).

*Id.,* 483 Pa. at 399–400, 396 A.2d at 1230.

Randolf Rose was accused of the murder and robbery of Russel Leary. At his trial, testimony was introduced that on the same morning as the Leary murder, Rose also shot and robbed Robert Edwards and shot and attempted to rob Gary Crosley. Rose argued that the admission of these two other crimes was error.

We rejected this argument. In an opinion by Chief Justice Eagen, this Court reasoned:

Here, Edwards, Leary and Crosley were all shot in the back at close range in the course of or in an attempt to commit a robbery. The circumstances of and the manner in which the Edwards and Crosley crimes were committed were very similar to that of the Leary crime. All occurred within a short period of time and in a limited geographical area. Clearly, a close connection was established sufficient to permit the conclusion that all three crimes were committed by one individual, and to aid in establishing this individual's identity. Thus, evidence of the other crimes was properly admitted.

*Id.,* 483 Pa. at 400, 396 A.2d at 1230.

9. Mr. Justice Flaherty wrote a concurring opinion joined by two Justices. Mr. Justice Flaherty reasoned that since appellant had been acquitted of the Dougherty murder, no evidence of that crime was admissible under any circumstances. Mr. Justice Larsen concurred in the result.

Felder connection. He found this indirect connection between the major and minor premises of the Commonwealth's syllogism too tenuous to support the conclusion. However, he also stated that there was sufficient similarity between the Felder shooting and the Grice murder to allow admission of evidence of the Felder shooting at appellant's trial for the Grice murder under the exception which permits admission of unrelated criminal conduct in order to show a common plan or identity.

▇ In the present case, there is likewise sufficient similarity between the Grice and Summers murders to allow the admission of either at the trial of the other for the purpose of showing a common scheme, and hence appellant's identity as the actor in both. This is so even though a common scheme advanced to admit other crimes for the purpose of showing identity requires more features in common than one used just to show intent. II Wigmore, *Evidence in Trials at Common Law* § 304, at 249 (Chadbourn rev. 1979) (similarity sufficient for intent, but identity depends on "such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations"). In this case, we believe the common features create a sufficient likelihood that the same person committed both crimes to permit their admission for the purpose of showing identity.

The Commonwealth produced testimony that appellant confessed to killing both Grice and Summers in order to increase his influence over the drug trafficking trade in Center City Philadelphia by imposing fear on other drug dealers. N.T. at 4.12–14, 4.17. Both Grice and Summers were drug dealers in Center City Philadelphia. Appellant had known and interacted with both of these drug dealers. Both were killed within less than three months of each other. Both were killed by the same type of weapon and possibly the same gun. Both were killed above bars in an execution style. They were shot at close range in the head and their pockets were searched for money. Thus, the

admission of the Summers murder at a trial for the Grice murder is probative in showing both appellant's motive in seeking out Grice to murder and rob and his identity as the actor who committed the crime.

### III

Appellant also argues that his due process rights were violated and that the trial court abused its discretion by not granting a continuance of the penalty phase of the trial so that his mother and stepfather could travel from New York to testify on his behalf. Both of these arguments lack merit.

The jury returned a verdict of guilty of first degree murder on Friday morning, May 24, 1985. Before May 24, defense counsel had asked appellant to have his mother and stepfather present at the trial in case the jury returned a guilty verdict. N.T. at 6.18. Appellant refused, allegedly because he did not want to put his mother and stepfather through the trauma of another murder trial. Appellant did not agree to have his mother and stepfather testify until May 24, and it was not until that time that he told his defense counsel that they could not arrive until the following Tuesday.[10] At 3:11 p.m. that afternoon, defense counsel moved for a continuance so that the mother and stepfather could testify. This motion was denied by the trial court. At the penalty hearing, the jury heard the testimony of a psychiatrist who explained the difficult life appellant had as a child.

Appellant relies on *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986). In *Skipper*, the defendant, at the penalty phase of his trial, wanted to introduce the testimony of two jailers and a "regular visitor" who would have stated that the defendant had made a "good adjustment" during his time in jail before trial. The trial court held that this testimony was irrelevant, and therefore, inadmissible. *Id.* 106 S.Ct. at 1670.

10. Monday was a legal holiday.

On appeal the United States Supreme Court held that exclusion of this testimony was inconsistent with the rule of *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) that "the sentencer . . . not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* at 110, 102 S.Ct. at 874 (quoting *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978)) (emphasis in original). The Court reasoned that evidence that the defendant would not be a danger in prison was potentially mitigating, and the defendant's due process rights were violated by the exclusion of such evidence. *Skipper*, 106 S.Ct. at 1671. The Court said the defendant must be "permitted to present any and all relevant mitigating evidence that *is available.*" *Id.* 106 S.Ct. at 1673 (emphasis added). The *Skipper* decision is distinguishable from the present case on two grounds.

 First, the trial court in this case would have admitted the mother and stepfather's testimony if they were present to testify. Appellant, unlike the defendant in *Skipper*, was unable to "proffer" their testimony at the appropriate time because he refused to request their presence until the jury returned a guilty verdict. Because of appellant's deliberate act, the alleged mitigating evidence was "not available" at the time of the penalty hearing.[11]

Moreover, unlike the disputed testimony in *Skipper*, it appears the only testimony this appellant could obtain from his mother and stepfather is that he had a difficult childhood. This would have been cumulative to the psychiatrist's testimony. Therefore, even if the trial court did commit error, we must consider whether it was harmless beyond a reasonable doubt. *Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155 (1978).

11. *Cf. Mrs. Smith Pie Co. v. Workmen's Compensation Appeal Board,* 57 Pa. Commonwealth Ct. 274, 279, 426 A.2d 209, 212 (1981) (foregoing ample opportunity to acquire favorable evidence viscerates due process argument).

In *Skipper,* the state argued that the disputed testimony was cumulative because the defendant and his former wife had stated that his conduct in jail was satisfactory. The Supreme Court rejected this argument. It reasoned

that characterizing the excluded evidence as cumulative and its exclusion as harmless is implausible on the facts before us. The evidence petitioner was allowed to present on the issue of his conduct in jail was the sort of evidence that a jury naturally would tend to discount as self-serving. The testimony of more disinterested witnesses—and, in particular, of jailers who would have had no particular reason to be favorably predisposed toward one of their charges—would quite naturally be given much greater weight by the jury.

*Skipper,* 106 S.Ct. at 1673.

In the present case, appellant had testimony on his difficult childhood from a disinterested expert witness, the psychiatrist, whose testimony was admitted during the penalty phase of the trial. The jury would be more likely to consider the mother's and stepfather's testimony self-serving. Since their testimony would have been cumulative to that of the disinterested witness, this case is the converse of *Skipper.*

Insofar as the presence of petitioner's mother and stepfather would be likely to evoke sympathy for him, it should be noted that a jury has no constitutional duty to consider "mere sympathy." *California v. Brown,* ——— U.S. ———, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987).

Of course, we could speculate that the mother and stepfather would testify about other factors. The record shows, however, that defense counsel did not specify that they would testify about any other mitigating factor. We will not assume that they would do so. *See Commonwealth v. Murphy,* 493 Pa. 35, 40, 425 A.2d 352, 354 (1981) (evidence not specified at time of initial request before trial court, will not be considered for first time on appeal). Therefore, we are satisfied that the denial of the continuance was harmless beyond a reasonable doubt.

■ In a related argument appellant contends that even if he did not have a due process right to the continuance, the trial court's failure to grant it was an abuse of discretion. This argument is without merit as well. At the outset, appellant's good faith in requesting the continuance is subject to question. Just prior to requesting this continuance, defense counsel persuaded the prosecutor to stipulate to some of the underlying premises of Dr. Sadoff, the defense expert. The prosecutor agreed to this stipulation because if he did not, the trial would not finish "until Tuesday," and the prosecutor felt the delay "would be to the detriment of the Commonwealth." N.T. at 6.17. Only after gaining this concession on threat of postponement did the defense pursue postponement on the ground asserted here.

Appellant alleges that the only reason the trial court denied the continuance was so the jury, and one juror in particular, would not have to return on Tuesday. If this were actually the case, then the trial court should be strongly criticized for what would be a clearly inappropriate motive for denying a continuance.

It is not clear from the record, however, just what was the reasoning behind the trial court's decision. While it is true that the trial court did make an unfortunate statement that he promised the jury that the trial would be finished by Friday, it is not likely that this was the sole reason for denying the continuance. For example, just before this statement appellant's counsel conceded that there was no legitimate excuse for not having the witnesses available at this time. N.T. at 6.18–19. This, and other unstated reasons would properly play a role in the trial court's exercise of its discretion.

In *Mackarus Estate*, 431 Pa. 585, 246 A.2d 661 (1968), we stated:

'When the court has come to a conclusion by the exercise of its discretion, the party complaining of it on appeal has a heavy burden; it is not sufficient to persuade the appellate court that it might have reached a different

conclusion if, in the first place, charged with the duty imposed on the court below; it is necessary to go further and show an abuse of the discretionary power.' See: *Garrett's Estate, supra* [355 Pa. 287], 292–93 [6 A.2d 860] (1939). If there is any basis for the [trial] Court's decision, the decision must stand.

*Id.,* 431 Pa. at 596, 246 A.2d at 666–67 (footnote omitted).

In *Commonwealth v. Smith,* 442 Pa. 265, 275 A.2d 98 (1971), we set out the factors to be considered in determining whether a continuance should be granted. In *Smith,* we stated:

Considerations underlying the exercise of that discretion include whether the witness is necessary to strengthen the defendant's case ... the essentiality of the witness to appellant's defense and the diligence exercised to procure his presence at trial ... the facts to which the witness could testify ... and, the likelihood that the witness could be produced at the next term of court.

*Id.,* 442 Pa. at 270, 275 A.2d at 101 (citations omitted).

The mother's and stepfather's testimony would merely have been cumulative to that of the psychiatrist. In addition, since appellant did not try to contact his mother and stepfather until the day of the trial, he failed to act with due diligence. The trial court did not abuse its discretion in denying the request for a continuance.

## IV

Appellant contends that his due process rights were violated at the penalty phase of his trial when the prosecutor told the jury that people who are sentenced to life imprisonment do not often spend their entire life in jail. Citing our decision in *Commonwealth v. Floyd,* 506 Pa. 85, 484 A.2d 365 (1984), appellant argues that the prosecutor improperly tried to persuade the jury to impose the death sentence by telling them that appellant may someday be paroled. This argument fails on review of the circumstances under which the prosecutor's statement was made. It came in proper response to a factually misleading statement

by appellant's counsel on what a life sentence meant, and therefore, did not violate appellant's right to a fair and just trial.

The prosecutor's comments at issue are:

Counsel stood in front of you and said to you that life imprisonment is life without parole. Anyone who is alive and in this society knows that people who are sentenced to life imprisonment do not often spend their entire life in jail.

. . . .

Do not be misled by that argument. Do not sit here with the confidence that if you sentence this defendant to life imprisonment, that he indeed will spend the entire remainder of his life in prison.

N.T. at 6.57–58.

■■■ Under Pennsylvania law, such comments when deliberately injected by the prosecutor seriously prejudice the defendant's right to a fair and just trial.[12] *Commonwealth v. Aljoe*, 420 Pa. 198, 216 A.2d 50 (1966). *See also Commonwealth v. Floyd, supra.* This Court reasoned:

'whether the defendant might at any future time be pardoned or have his sentence commuted is no concern of theirs and should not enter in any manner whatsoever

---

**12.** These statements are permissible under the Eighth Amendment of the Constitution of the United States, as applied to the states through the Fourteenth Amendment. *California v. Ramos,* 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983). In *Ramos,* the trial court, as required by California law, instructed the jury at the penalty phase of a murder trial that a sentence of life imprisonment without the possibility of parole may be commuted by the Governor to a sentence that includes the possibility of parole. (This was known as the *Briggs* Instruction). The jury returned a verdict of death, but the California Supreme Court held that the *Briggs* Instruction violated the Federal Constitution. The United States Supreme Court granted certiorari, and reversed. In an opinion by Justice O'Connor, the Court held that the possibility of future commutation was an appropriate element for the jury to consider. The Court reasoned that the *Briggs* Instruction invited the jury to consider whether the defendant has such an undesirable character that it would be inappropriate to provide him with the chance to return to society. The Court concluded that the *Briggs* Instruction "supplies the jury with accurate information for its deliberation in selecting an appropriate sentence." *Id.* at 1009, 103 S.Ct. at 3458.

into their consideration of the proper penalty to be imposed, which should be determined solely in the light of the relevant facts and circumstances as they then existed.'

*Aljoe,* 420 Pa. at 208, 216 A.2d at 55 (quoting *Commonwealth v. Johnson,* 368 Pa. 139, 148, 81 A.2d 569, 573 (1951)). Allegedly improper comments by a prosecutor, however, must be examined within the context of defense counsel's conduct. *Commonwealth v. D'Ambro,* 500 Pa. 303, 456 A.2d 140 (1983).

An examination of defense counsel's argument at the penalty phase of the trial reveals the following relevant statement:

You understand in this State, life imprisonment is without parole. Now, the Governor can commute, *but in the last eight years there has [sic] only been four commutations and therefore that is a special case.* Don't misunderstand life imprisonment is ten years in prison. Life imprisonment is forever.

Life means life in this State. There is no parole in life imprisonment, only the Governor can commute.

N.T. at 6.47 (emphasis added). As the Commonwealth points out in its brief, this statement by defense counsel is wrong and would be misleading if not corrected. There were nineteen, not four, commutations of life sentences during the eight year period prior to the sentencing hearing. Analyses of the Action of the Board of Pardons for the Years 1978–1985. Furthermore, this total is relatively low compared to the seven years before that period. Between 1971 and 1977, 234 sentences were commuted. Analyses of the Action of the Board of Pardons for the Years 1971–1977. Also, 234 prisoners who had sentences commuted to life were actually released from prison between 1971 and 1985. During that same period, only 76 prisoners who had their sentences commuted to life actually died in prison. *See* Appellee's Brief at 11, quoting figures obtained from the Pennsylvania State Department of Corrections, Division of Planning, Research and Statistics.

Under these circumstances, the present case is distinguishable from *Commonwealth v. Aljoe, supra,* and *Commonwealth v. Floyd, supra.* In *Aljoe,* without any prior mention by defense counsel, the prosecutor raised the issue of parole in arguing that a life term did not really mean imprisonment for life. The prosecutor then speculated on what the defendant might do if he were released from jail. *Aljoe,* 420 Pa. at 201, 216 A.2d at 52. Similarly in *Floyd,* again without any prior statement by defense counsel, the prosecutor stated that if given a life sentence, Floyd could either be paroled or escape, and implied that if either happened, he might next try to kill one of the jurors. *Floyd,* 506 Pa. at 95, 484 A.2d at 370. These statements are more seriously and plainly prejudicial because the prosecutors there speculated on what the defendant might do if paroled. Even more importantly, they were not made in response to a misleading statement by defense counsel. They are not within any analogy to the doctrine of invited error. Defense counsel in *Aljoe* and *Floyd* did not open the door for the prosecution.

The present case is, however, analogous to *Commonwealth v. Gwaltney,* 497 Pa. 505, 442 A.2d 236 (1982). In *Gwaltney,* defense counsel asked the interrogating police officer whether the defendant had requested an attorney. The officer said that he had not. The prosecutor then asked the officer whether the defendant had counsel present at the interrogation. The officer answered affirmatively.

On appeal before this Court, the defendant in *Gwaltney* argued that the prosecutor's question concerning the presence of the defendant's attorney at the interrogation was constitutional error based on this Court's decision in *Commonwealth v. Haideman,* 449 Pa. 367, 296 A.2d 765 (1972). In *Haideman,* we held that a testimonial reference to an accused's silence and request for an attorney was a violation of the Fifth Amendment and reversible error. We found the *Haideman* decision distinguishable in *Gwaltney.* In an opinion by Mr. Justice Larsen, we agreed that this question was improper if initially asked by the prosecution

because it suggested an inference of guilt should be drawn from a defendant's exercise of his Fifth Amendment rights to silence. However, because the question was preceded by defense counsel's inappropriate attempt to mislead the jury into drawing an inference of innocence from defendant's willingness to forego counsel, we stated:

it is not a violation of the Fifth Amendment for a prosecutor to elicit testimony concerning a defendant's exercise of his Fifth Amendment rights, if it is not designed to suggest an inference of guilt, but rather to refute an inference that the defense has improperly suggested. *Commonwealth v. Kahley,* 467 Pa. 272, 356 A.2d 745 (1976).

In his cross-examination of the interrogating officer, defense counsel attempted to mislead the jury into believing that appellant had never requested that a lawyer be present on the day of the interrogation, and thus was endeavoring to create the misimpression that appellant decided to forgo his Fifth Amendment right to counsel to suggest an inference of innocence. Thus, the question by the prosecutor was proper because it was designed to prevent the jury from being mislead.

*Gwaltney,* 497 Pa. at 510, 442 A.2d at 239.

The same reasoning applies in the present case. Here, had the prosecution initiated the issue of parole, appellant's right to a fair and just disposition of the penalty issue might have been denied. Instead, the record shows that the prosecutor was trying to prevent the jury from being misled by defense counsel's improper statements. Appellant's argument is without merit.

For the foregoing reasons, appellant's convictions and sentences of death are affirmed.

FLAHERTY, J., files a dissenting opinion in which ZAPPALA, J., joins.

McDERMOTT, J., files a dissenting opinion.

FLAHERTY, Justice, dissenting.

Although I agree that appellant's conviction should be upheld, I take this opportunity to voice my disapproval of the extensive discussion by the majority regarding the circumstances of a crime which was unrelated to the matters sub judice and of which appellant was completely exonerated by virtue of his acquittal. Everyone in America who stands *accused* of a crime is presumed—is—innocent until proven guilty. Appellant was acquitted of the Dougherty murder, and that acquittal forecloses any further consideration that appellant may have committed that offense. Thus, any similarity between the Grice and Summers murders and the Dougherty murder, while interesting from an historical perspective, is not a proper consideration in reviewing appellant's present convictions. See, my authored concurring opinion filed in *Commonwealth v. Clayton*, 506 Pa. 24, 34, 483 A.2d 1345, 1350 (1984).

I dissent because, in my view, the trial court's denial of appellant's request for a short continuance of the sentencing phase, from 3:11 p.m. to the next regular court business day, so that appellant's *mother* could testify on his behalf, constituted an abuse of discretion. In assessing the propriety of the court's ruling, it is critical to remember that this is a death case, and it hardly needs repeating here that death is a severe and irreversible penalty. In view of the awesome severity of the punishment that was imposable and indeed imposed, the slight delay necessary to facilitate the mother's appearance and testimony at her son's trial for his life seems a minimal imposition on the criminal justice system. Moreover, when a man's life hangs in the balance, the preference of one of the jurors to attend a school on the next scheduled court business day should carry minimal weight in determining whether to grant a continuance, especially to provide a mother's relevant testimony on behalf of mitigating circumstances!

The majority concludes the denial of the request for a short continuance was justified because the mother's testimony would have been cumulative. The mother would have

testified that appellant's early development was marred by witnessing the shooting of his mother by his father when appellant was five years old, the subsequent absence of a father-figure, and extreme poverty such that appellant learned to steal for food at his mother's knee. I would not lightly dismiss the proffered testimony as cumulative merely because the parties stipulated that a psychiatrist would have testified to the same events, primarily because I believe a mother's testimony necessarily has a uniquely strong effect upon the fact finder—certainly different from the effect of hearing a psychiatric report read into the record!

In closing, the Commonwealth argued, "The only way you [the jury] know that he [appellant] *supposedly* saw his father shoot his mother is because Willie Clayton told Dr. Sadoff. . . . Dr. Sadoff finally based his opinion on what this man, Willie Clayton, in his self-serving history said to Dr. Sadoff." The clear implication is that appellant lied to the psychiatrist. The Commonwealth thus attempted to discredit the psychiatrist's conclusions by arguing that the underlying data which was supplied by appellant was unreliable. Had appellant's mother been allowed to testify, it is possible, of course, that the jury could have viewed her testimony as biased and self-serving as well, but it is also possible that she would have corroborated appellant's version and bolstered the validity of the psychiatrist's conclusions.

The majority also justifies the exclusion of the mother's testimony because "a jury has no constitutional duty to consider 'mere sympathy.' *California v. Brown*, — U.S. ——, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987)." Maj. op. at 281. That the jury is not required to sympathize with a defendant is indisputable, and thus it is that juries are cautioned to listen to and apply the law given them by the court to the facts which are properly proved. Nevertheless, inherent in the power of the jury is the *power* to dispense mercy. It is true that, in other contexts, our cases have limited the jury's mercy dispensing function to avoid the possibility of

verdicts that are arbitrary, *Commonwealth v. Williams*, 490 Pa. 187, 191, 415 A.2d 403, 405 (1980). Likewise, the death penalty statute has structured the procedure for imposing the death sentence to avoid the possibility of sentences which are wholly arbitrary. Nevertheless, the jury's common law capacity to dispense mercy, albeit not totally unbridled, has been preserved. Our cases have recognized:

> [The Pennsylvania death penalty] statute permits the defendant to introduce a broad range of mitigating evidence that can support the finding of one or more mitigating circumstances which may outweigh the aggravating circumstances found by the jury. *Appeals for mercy and leniency can be founded upon and made through introduction of evidence along this broad spectrum of mitigating circumstances.*

*Commonwealth v. DeHart*, 512 Pa. 235, 257, 516 A.2d 656, 668 (1986), quoting *Commonwealth v. Peterkin*, 511 Pa. 299, 327, 513 A.2d 373, 387 (1986). (Emphasis supplied.) The weighing function represents the essence of the jury's capacity to dispense mercy in a death penalty proceeding, and, under the circumstances of this case, it appalls me that appellant was denied the right to adequately present all the mitigating circumstances he chose.

Because it is impossible to predict what effect the mother's testimony might have had upon the jury, I would reverse the judgement of sentence of death and remand for imposition of a life sentence.

ZAPPALA, J., joins this dissenting opinion.

McDERMOTT, Justice, dissenting.

I am obliged to dissent. I believe that under the facts here appellant was entitled to have the jury charged on the ancient juridical principle that since one is presumed innocent an inference which posits either guilt or innocence must be drawn in favor of the accused.

I am not persuaded beyond a reasonable doubt that its omission was harmless.