663 A.2d 707

**COMMONWEALTH of Pennsylvania**

**v.**

**Steven C. LYTLE, Appellant.**

Superior Court of Pennsylvania.

Submitted June 15, 1995.

Filed Aug. 2, 1995.

128

Shelley Stark, Public Defender, Pittsburgh, for appellant.

Sandra Preuhs, Assistant District Attorney, Pittsburgh, for Commonwealth, appellee.

Before CIRILLO, FORD ELLIOTT and HESTER, JJ.

CIRILLO, Judge:

Steven C. Lytle appeals from a judgment of sentence entered in the Court of Common Pleas of Allegheny County. We affirm.

Lytle was charged with one count of criminal homicide following the death of his three-month-old daughter, Samantha. Lytle waived his right to a jury trial, and a bench trial commenced before the Honorable James R. McGregor. On April 13, 1994, Lytle was found guilty by Judge McGregor of first-degree murder and was sentenced to life imprisonment. Lytle filed a timely notice of appeal and raises two issues for our consideration:

(1) Whether the evidence was insufficient to prove first-degree murder, in that the Commonwealth failed to disprove that Appellant was so intoxicated at the time of the murder as to be incapable of forming the specific intent to murder?

(2) Whether the trial court erred in permitting testimony of "other crimes" evidence?

When we evaluate a challenge to the sufficiency of the evidence, we must determine whether, viewing the evidence in the light most favorable to the Commonwealth as verdict winner, together with all reasonable inferences therefrom, the trier of fact could have found that each and every element of the crimes charged was established beyond a reasonable doubt. *Commonwealth v. Jarman*, 529 Pa. 92, 94–95, 601 A.2d 1229, 1230 (1992); *Commonwealth v. Swann*, 431 Pa.Super. 125, 635 A.2d 1103 (1994). "This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt." *Commonwealth v. Swerdlow*, 431 Pa.Super. 453, 458, 636 A.2d 1173, 1176 (1994) (citing *Commonwealth v. Hardcastle*, 519 Pa. 236, 246, 546 A.2d 1101, 1105 (1988), *cert. denied*, 493 U.S. 1093, 110 S.Ct. 1169, 107 L.Ed.2d 1072 (1990)); *Commonwealth v. Chmiel*, 536 Pa. 244, 639 A.2d 9 (1994). Furthermore, a mere conflict in the testimony of the witnesses does

not render the evidence insufficient, because "it is within the province of the fact finder to determine the weight to be given to the testimony and to believe all, part, or none of the evidence." *Commonwealth v. Moore,* 436 Pa.Super. 495, 501, 648 A.2d 331, 333 (1994) (citations omitted); *see also Commonwealth v. Rivers,* 537 Pa. 394, 409, 644 A.2d 710, 717 (1994) (the credibility of a witness is a question for the fact finder).

"A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing." 18 Pa.C.S.A. § 2502(a). An "intentional killing" is defined as "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." 18 Pa.C.S.A. § 2502(d).

▮▮▮▮ Lytle claims that, at the time he punched his daughter, he was so intoxicated that he was unable to form the specific intent necessary for a conviction of murder in the first degree. Lytle argues that his intoxication worked to reduce murder from a higher degree to a lesser degree.

Evidence of voluntary intoxication or drugged condition may be used to reduce murder from a higher degree to a lower degree. 18 Pa.C.S.A. § 308. The theory of this rule of law is that a person overwhelmed by the effects of alcohol or drugs cannot form a specific intent to kill. As this court stated in *Commonwealth v. England,* 474 Pa. 1, 375 A.2d 1292 (1977):

"Where the question of intoxication is introduced into a murder case its only effect could be to negate the specific intent to kill which is required for a finding of murder of the first degree.... If intoxication does render an accused incapable of forming the necessary intent the result is to reduce the crime to a lesser degree of murder. In no event does the reduction change the character of the crime from murder to manslaughter."

*Id.,* 474 Pa. at 19–20, 375 A.2d at 1301. Further, **in order for intoxication to reduce murder from a higher to a lower degree, it must be proven that the actor was overwhelmed to the point of losing his faculties and**

**sensibilities.** *Commonwealth v. Reiff,* 489 Pa. 12, 15, 413 A.2d 672, 674 (1980).

In this case, although Breakiron testified that he drank a number of sixteen ounce beers and one or more shots of whiskey during the evening of March 23–24, 1987, and that he 'had a "buzz" on,' he also testified that he had no trouble driving, that he drove away from the bar. . . . Because there was evidence of intoxication in the case, the trial court instructed the jury on voluntary intoxication, but it is apparent the jury did not believe that Breakiron's faculties and sensibilities were so overwhelmed with alcohol that he could not form the specific intent to kill. It is equally obvious that such a determination was for the jury to make. . . .

*Commonwealth v. Breakiron,* 524 Pa. 282, 295–96, 571 A.2d 1035, 1041 (1990) (emphasis supplied).

Accordingly, for a defendant to succeed in reducing murder from first-degree to third-degree by reason of his intoxication, he must demonstrate that he was overwhelmed to the point of losing his faculties and sensibilities so that he could not form the specific intent to kill. *Breakiron, supra.*

Lytle maintains that the evidence was insufficient because the Commonwealth failed to disprove that his intoxication negated the intent required for first-degree murder and that, therefore, the Commonwealth did not prove the intent element of the crime beyond a reasonable doubt. *See Commonwealth v. Edmiston,* 535 Pa. 210, 634 A.2d 1078 (1993) (once a defendant has demonstrated that he was overwhelmed to the point of losing his faculties and sensibilities, it then rests upon the Commonwealth to disprove this defense and to establish, beyond a reasonable doubt, that the specific intent to kill did exist). The Commonwealth, on the other hand, argues that Lytle did not establish that he was overwhelmed, by reason of his intoxication, to the point of losing his faculties and sensibilities. We must determine, therefore, whether, viewing the evidence in the light most favorable to the Commonwealth as verdict winner, together with all reasonable inferences therefrom, the trier of fact could have found that the element of

intent was established beyond a reasonable doubt. *Jarman, supra,* at 529 Pa. 92, 601 A.2d 1229; *Swann, supra,* at 431 Pa.Super. 125, 635 A.2d 1103.

The facts of this case are as follows. On August 13, 1993, Lytle purchased a case of beer and began drinking it with his brother, Daniel, and Lytle's girlfriend, Bonnie Windhorst. Lytle began consuming the beer around 7:30 p.m. Lytle consumed approximately twelve twelve-ounce cans of beer between 7:30 p.m. and midnight.

Throughout the evening, as Lytle drank, he played cards with Bonnie and Daniel. Lytle also played video games and darts. Lytle did not eat at all during this time. At approximately 10:30 p.m., Daniel fed Samantha and then left the apartment. Immediately after Daniel left, Lytle burped Samantha and put her down to sleep. Up to this point, Samantha appeared to be fine. While Lytle was laying Samantha down, Bonnie was in the bathroom. Bonnie heard the baby cry once and asked Lytle what had happened. Lytle told Bonnie that Samantha had dropped her pacifier. Samantha did not cry again.

Lytle returned to the living room and continued to play video games. Bonnie returned from the bathroom and laid down on the couch; she had not checked on Samantha. Sometime later, Bonnie awoke to a "bang," which was caused by Lytle dropping his beer. Bonnie got up, got Lytle another beer, and then laid back down on the couch.

Sometime around midnight, Lytle woke Bonnie up and the couple went into their bedroom. Lytle went into Samantha's room and Bonnie heard him scream and hit the wall. Bonnie ran into Samantha's room and saw Samantha laying in the bassinet with blood coming from her ear. Samantha did not appear to be breathing. The paramedics were called. Lytle then punched a hole in a wall, knocked a closet door off of its hinges, threw things, and screamed. Bonnie testified that she tried to calm Lytle down and that Lytle got another beer and began to cry.

Lytle went into Samantha's room, sat down on the floor, and began to rock back and forth with Samantha's baby blan-

ket,while talking to the blanket as if it were Samantha. Bonnie testified that Lytle did not say anything, but that when Bonnie was on the telephone with her mother she thought she heard him say, "what did I do?"

Samantha was life-flighted to Children's Hospital by helicopter, and Bonnie went to the hospital immediately thereafter. Lytle, however, remained at the apartment with a neighbor, Martin Kauer, in an attempt to become sober before he went to the hospital. After Lytle had arrived at the hospital, doctors explained that the injuries which Samantha had sustained did not result from a fall, but, rather, resulted from blows to the head. At that point, Bonnie asked Lytle, "What did you do?" Lytle responded by striking Bonnie in the face, and Lytle was then removed from the area.

Mary Pierce, M.D., examined the child at the hospital's emergency room and noted multiple skull fractures. She determined that the injuries were very recent, due to the fluids oozing from Samantha's ear. Dr. Pierce stated that had the injuries been older, then Samantha would have lost complete consciousness and would not have been able to whimper. Dr. Pierce advised Samantha's family members that Samantha would not survive due to the severity of her injuries.[1]

On August 14, 1993, Lytle was questioned by police. He eventually confessed to striking Samantha three to four times in the head with his fist sometime between 10:30 p.m. and 12:00 p.m. on August 13th. Lytle told police that he had been drinking that night and that, although he had consumed about twelve beers, he did not feel intoxicated. Lytle described his condition to police as having "a little buzz on." Lytle also stated that he was a heavy drinker and consumed this amount of alcohol on a regular basis. Lytle testified at trial that "my kind of drunk is falling over when you get up. When I say I am buzzed, I can walk. I am stumbling a little bit, but I can walk. That is a buzz to me." Lytle also testified that it was

1. Dr. Leonid Rozin, of the Allegheny Coroner's Office, performed an autopsy on Samantha and his opinion as to the cause of death was severe cranial trauma.

"unusual" for him to drink ten, twelve, or thirteen beers because he usually drinks more.

■ On the night that Lytle punched Samantha in the head three to four times with his fist, he claims that he was so intoxicated that he was overwhelmed to the point of losing his faculties and sensibilities. The record, however, does not support this contention. Lytle testified that it was not uncommon for him to consume twelve beers on one occasion as he did on August 13th. On that night, Lytle drank approximately twelve beers and his testimony reflects that he was not "falling down" drunk, as he puts it, but that he only had "a little buzz on." Thus, Lytle's own testimony shows that, although he had consumed twelve beers, he was not so intoxicated as to overwhelm his faculties and sensibilities. Moreover, the Pennsylvania Supreme Court noted in *Breakiron, supra,* that a defendant's statement that he "had a 'buzz' on" is insufficient to establish that the person's faculties and sensibilities were so overwhelmed by alcohol that he could not form the specific intent to kill. *Breakiron,* 524 Pa. at 296, 571 A.2d at 1041–42.

In addition, while Lytle claims that his level of intoxication at the time he struck Samantha prevents him from remembering what he had done to Samantha or why he had done it, he still possessed recollection of details surrounding the incident. For example, Allegheny County Detective Gary Tallent testified that he interviewed Lytle at around 10:00 a.m. on August 14, 1993. Lytle remembered what time his brother Daniel left the apartment the previous evening, what time the assault occurred, what time he and Bonnie went to bed (around midnight), and Lytle's recollection comported with the testimony of other witnesses. Also, Lytle could describe Samantha's position in the bassinet when he hit her. This description comported with Samantha's physical injuries. Lytle knew that he had struck Samantha with his right fist and he estimated the number of blows.[2] Also, at trial, Lytle agreed

---

2. In addition, Lytle's friend Kauer testified that Lytle knew who Kauer was when he arrived at Lytle's apartment and that Lytle calmed down when Kauer told him to do so.

that he did not "blackout" on the evening of August 13th, and that he had no trouble remembering "certain events" the day following the incident. Lytle's testimony and "selective recollection" indicates that he was in control of his faculties and sensibilities at the time he struck Samantha and that he was not so intoxicated as to be unable to form a specific intent to kill. *See Commonwealth v. Stantz*, 353 Pa.Super. 95, 107, 509 A.2d 351, 357 (1986) (holding that defendant's "selective, but vivid recollection" of details surrounding incident indicates that defendant was in control of his faculties).

The testimony of witnesses as to Lytle's conduct on August 13th and during the early morning hours of August 14th also establishes that Lytle was not so intoxicated that his faculties and sensibilities were overwhelmed by alcohol. Dr. Pierce, who spoke with Lytle and the rest of Samantha's family at the emergency room, testified that Lytle's speech was not slurred, that he walked normally and that his reflexes were quick in the sense that he was very quick to strike Bonnie when she confronted him about what he did to Samantha. Dr. Pierce also testified that Lytle did not seem to have a decreased level of awareness or alertness and by no means appeared to be intoxicated. Also, Kauer testified that, when he arrived at Lytle's apartment, Lytle was not staggering and his speech was not slurred.

Evidence which further supports the conclusion that Lytle was not overwhelmed by his drinking was that, immediately after Samantha was taken to the hospital, he denied responsibility for what had occurred. Specifically, when questioned by Bonnie, Lytle initially denied any knowledge of what could have happened to Samantha. Lytle then told Kauer and ambulance personnel that Samantha could have fallen or been dropped into the crib. Lytle also spoke with Thomas O'Toole, an on-call social worker from Children's Hospital, at about 2:00 a.m. at the hospital. Lytle told O'Toole that, the previous day, he had dropped Samantha about six to eight inches on the couch. Lytle's attempts to deny responsibility immediately after the situation suggests that he was sufficiently in control of himself at that point to realize the gravity of his conduct

and to feel the need to deflect blame.[3] *See Stantz,* 353 Pa.Super. at 107, 509 A.2d at 357 (holding that facts indicating a "plan of deception" negate a finding that a defendant was intoxicated to the point that his faculties and sensibilities were overwhelmed).

In his defense, Lytle offered the testimony of Dr. Charles L. Winek, Chief Toxicologist for Allegheny County. Dr. Winek estimated that, under the facts of this case, Lytle's blood alcohol content on the night he struck Samantha was .20. Dr. Victor Adebimpe, a board certified psychiatrist, testified that he had diagnosed Lytle as suffering from two separate mental conditions: alcohol dependence, and affective disorder, which meant that Lytle had previous episodes of depression. Dr. Adebimpe agreed, however, that neither depression nor alcohol dependency would prevent someone from forming the intent to kill and that the crucial factor was the level and quality of the intoxication.

"Evidence of intoxication, *if believed,* may operate to negate the intent necessary for a conviction of murder in the first degree. Such evidence is submitted for the consideration of the factfinder." *Stantz,* 353 Pa.Super. at 106, 509 A.2d at 357 (emphasis added). Thus, it was for the trial court, sitting as the finder of fact, to determine whether the evidence submitted by Lytle was convincing. *Moore, supra,* at 495, 648 A.2d 331 (holding that matters of credibility are solely within the province of the trier of fact). After carefully reviewing the record, we conclude that, viewing the evidence in the light most favorable to the Commonwealth as verdict winner, together with all reasonable inferences therefrom, the trier of fact could have found that the specific intent required for first-degree murder was established beyond a reasonable doubt. *Jarman, supra,* at 529 Pa. 92, 601 A.2d 1229; *Swann, supra,* at 431 Pa.Super. 125, 635 A.2d 1103.

3. Lytle also attempted to direct blame at Bonnie when first questioned by Detective Gary Tallent on the morning of August 14th. Lytle implied that Bonnie inflicted Samantha's injuries; he told Detective Tallent that Bonnie may have entered Samantha's room while he was playing video games.

■■■ In his second issue, Lytle argues that the trial court erred in admitting evidence of Lytle's prior abuse of Samantha. Evidence of other criminal activity is generally inadmissible against a defendant at his trial on another charge. *Commonwealth v. Martinez,* 301 Pa.Super. 121, 447 A.2d 272 (1982). Evidence of other crimes is admissible, however, if it falls within one of the well-defined exceptions to the general rule. *Commonwealth v. Billa,* 521 Pa. 168, 555 A.2d 835 (1989). It is important to note that even if a particular exception applies, the probative value of the "other crimes" evidence must outweigh its prejudicial effect. *Commonwealth v. Seiders,* 531 Pa. 592, 596, 614 A.2d 689, 691 (1992).

■■■ One of the legitimate purposes for admitting evidence of a defendant's distinct crimes is to prove intent. *Seiders, supra.* When evidence of other crimes is relevant and important to prove intent, it is generally conceded that the prejudicial effect may be outweighed by the probative value. *Commonwealth v. Marsh,* 388 Pa.Super. 610, 619–20, 566 A.2d 296, 300 (1989) (citing *Commonwealth v. Clayton,* 516 Pa. 263, 287 n. 8, 532 A.2d 385, 392 n. 8 (1987) (quotations omitted)). In addition, the Pennsylvania Supreme Court has stated:

[E]vidence concerning the previous relations between a defendant and a homicide victim is relevant and admissible for the purpose of proving ill will, motive or malice. Evidence of prior occurrences in which the accused threatened, assaulted, or quarreled with the decedent may be admissible for this purpose.

*Commonwealth v. Ulatoski,* 472 Pa. 53, 60–61, 371 A.2d 186, 190 (1977) (footnotes omitted).

In this case, the evidence which was admitted included Lytle's admission that he had punched Samantha in the stomach on a prior occasion. Also, Lytle told Detective Tallent that he would normally hit Samantha when she was crying.

Other evidence included Bonnie's testimony that she had noticed black and blue marks on Samantha, and that when she questioned Lytle about these marks he either denied knowledge of them or stated that he might have squeezed Samantha

138

too hard while changing her. Daniel, Lytle's brother, testified that he had previously told Lytle not to be so rough with Samantha, as he witnessed Lytle squeeze Samantha's arms and feet. Further, there was testimony presented that Lytle had difficulty dealing with Samantha's crying because he believed that she cried all the time. Finally, Lytle never sought medical treatment for Samantha's injuries.

Lytle contends that this evidence should not have been admitted because his intent was not at issue in this case. Lytle's contention is without merit. His intent was most certainly at issue in this case, as is reflected by Lytle's first argument. The admission into evidence of Lytle's prior treatment of Samantha was legitimate for purposes of proving intent, and the probative value of the evidence outweighed any prejudicial effect. *Seiders, supra,* at 531 Pa. 592, 614 A.2d 689; *Ulatoski, supra,* at 472 Pa. 53, 371 A.2d 186.

Judgment of sentence affirmed.