J-S59004-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| TINA M. GORDON, | |
| Appellant | No. 1452 WDA 2014 |

Appeal from the Judgment of Sentence August 6, 2014
In the Court of Common Pleas of Allegheny  County
Criminal Division at No(s): CP-02-CR-0001534-2014

BEFORE:  BOWES, DONOHUE, AND FITZGERALD,* JJ.

MEMORANDUM BY BOWES, J.:               **FILED NOVEMBER 09, 2015**

Tina M. Gordon appeals from the judgment of sentence of one-year probation that was imposed after she was convicted at a nonjury trial of one count of terroristic threats.  We reject her challenge to the sufficiency of the evidence supporting the conviction and affirm.

The evidence viewed in the light most favorable to the Commonwealth, as verdict winner, follows.  In January 2014, Zachary Robinson, his fiancée Kelly Brown, Brown's daughter Samantha Bergamasco, and the two young children of Robinson and Brown were renting space in Appellant's residence at 724 Garden City Drive in Monroeville. There was not a signed lease but a verbal arrangement which included rental of about $300 a month plus help with the utility bills.  On January 16, 2014, Mr. Robinson began to argue

---
* Former Justice specially assigned to the Superior Court.

with Samantha, and the exchange became heated. Appellant emerged from her bedroom, asked if Mr. Robinson "wanted her to take care of it," but he responded in the negative. N.T. Trial, 8/6/14, at 7.

Appellant then proceeded to open the door to Samantha's bedroom, and told Samantha's boyfriend Timothy, who had slept overnight, that "if he didn't have any money, he could get the F out of the house and we all could get out of the house as far as that's concerned." *Id*. Timothy told Appellant that he would not have any money until the following day so Appellant "wanted him to get out. She started packing his things[.]" *Id*. at 15. Additionally, Appellant "threatened to go get her gun if [they] didn't get out." *Id*. at 8.

Mr. Robinson went downstairs to gather his two young children and their belongings in order to leave. Mr. Robinson testified that, "I heard a loud thump when I was downstairs. When I come upstairs, Samantha was out on the porch with no shoes on, very little clothes." *Id*. at 7. Samantha explained that, after Timothy could not give Appellant money, Appellant grabbed Samantha by the arm and pulled her hair and started "screaming basically she'll kill everybody in the house, told me to go kill myself." *Id*. at 16. At that point, Appellant's son Joshua grabbed Samantha and removed her from the residence. Samantha's leg got caught in the door as Joshua slammed it. Appellant's friend Adrianna, whose surname was not given,

arrived on the scene and started to talk to Samantha, who wanted her clothing.

By that point, Mr. Robinson was back upstairs. He testified that Appellant was on the "steps in the hallway brandishing a firearm saying she'll kill everyone in the house" and that "she was going to kill everyone if we didn't leave." *Id*. at 7-8. Samantha also saw Appellant come "downstairs with a gun" and start "waving it around." *Id*. at 16. Mr. Robinson told Appellant, "We're getting reading to leave. . . . Give us two seconds." *Id*. at 8. Appellant responded, "No, get out," so Mr. Robinson pulled his two children out of the house. In the meantime, Joshua "pulled the gun out of her hand." *Id*. Before she was disarmed, Appellant was "either trying to point [the gun] at [Mr. Robinson] or Samantha," but Adrianna "pushed her hand up[.]" *Id*. at 9, 12. While Appellant was waiving around the gun, threatening to kill everyone and attempting to aim the gun at Samantha and Mr. Robinson, Mr. Robinson's two-year-old child was "standing next to my side. She didn't sleep for a week right, you know, after this all happened. . . . She was traumatized." *Id*.

Mr. Robinson had no intention of pressing charges. However, later that afternoon, after Appellant refused to give Ms. Brown and Mr. Robinson their belongings, Ms. Brown and Mr. Robinson reported the incident to Monroeville police. Police went and retrieved Samantha, who was a victim of the crime, and photographed the bruises on her arm and leg, which she

sustained during the assault by Appellant and Joshua. The photographs were introduced into evidence.

Police went to Appellant's home to conduct an investigation. Appellant explained that she was trying to remove the people who were staying at her home. She admitted that they had been paying rent, so police advised her to initiate eviction proceedings. Appellant also acknowledged to police that she owned a gun and kept it in her bedroom. Finally, she reported that "her son took it off her earlier in the day." *Id*. at 24. Police recovered a .38 caliber Smith and Wesson revolver on the bed. *Id*. at 25. The gun was loaded.

Based upon this proof, Appellant was convicted of one count of terroristic threats and acquitted of two counts of simple assault and one count of terroristic threats. This appeal followed imposition of a one-year probationary term. On appeal, Appellant raises one issue: "Was the evidence insufficient to establish terroristic threats as no actual intent to terrorize or reckless disregard for causing terror was present in this case when [Appellant] was merely acting in the heat of argument?" Appellant's brief at 4.

Initially, we observe: "In reviewing a challenge to the sufficiency of the evidence, we must determine whether, viewing the evidence in the light most favorable to the Commonwealth as verdict winner, together with all reasonable inferences therefrom, the trier of fact could have found that each

and every element of the crimes charged was established beyond a reasonable doubt." ***Commonwealth v. Leatherby***, 116 A.3d 73, 79 (Pa.Super. 2015).

Appellant was convicted of committing terroristic threats under 18 Pa.C.S. § 2706(a)(1), which states that a person commits "the crime of terroristic threats if the person communicates, either directly or indirectly, a threat to commit any crime of violence with intent to terrorize another[.]" The section mandates that the Commonwealth prove that "1) the defendant made a threat to commit a crime of violence, and 2) the threat was communicated with the intent to terrorize another or with reckless disregard for the risk of causing terror." ***Commonwealth v. Sinnott***, 976 A.2d 1184, 1188 (Pa.Super. 2009), *reversed on other grounds*, 30 A.3d 1105 (Pa. 2011).

In this case, the evidence unquestionably was sufficient to support the conviction since Appellant threatened to kill five people: Mr. Robinson, Samantha, Timothy, and Mr. Robinson's two children. Murder is a crime of violence. The threat was communicated with the intent to terrorize the four victims who understood what she was doing, since she made the threats repeatedly and she brandished a gun while making some of them. Mr. Robinson was obviously terrorized by her actions since he begged her to let him have a few more seconds as he hurriedly removed his children from the

home without their belongings and while Samantha was barefoot and wearing shorts on a winter day.

Relying upon her own testimony, Appellant recites a litany of grievances that she had against her tenants, maintains that they were not paying agreed-upon rent, and insists that she did not commit the crime in question since her words were mere spur-of-the moment threats arising during the course of an argument. The comment to § 2706 makes clear that the section is not intended to "penalize mere spur-of-the-moment threats which result from anger." Comment, 18 Pa.C.S. § 2703. Appellant claims that her statements were made during a momentary period of anger and fall within this category.

We first note that a position that a threat to commit a crime was spontaneously made during a moment of anger is treated as a challenge to the sufficiency of the evidence supporting the intent to terrorize. *Commonwealth v. Walker*, 836 A.2d 999 (Pa.Super. 2003). There are a number of cases, upon which Appellant relies, wherein we have held that momentary threats to kill made during a heated argument, when the defendant has no immediate means of effectuating the threat, are insufficient to sustain a terroristic threats conviction.

For example, in *Commonwealth v. Kidd*, 442 A.2d 826 (Pa.Super. 1982), Kidd, who was arrested for public drunkenness and was being treated for cuts at a hospital, created a disturbance, yelled obscenities at police, and

said that he would kill the police with a machine gun if he had the chance. We concluded that Kidd's statement to police, in light of the "facts and circumstances under which [Kidd's] threats were made," was insufficient to establish that Kidd "intended to place the officers in a state of fear that agitates body and mind." *Id*. at 827. We observed that Kidd was inebriated, restrained, and obviously angry at his situation.

Similarly, in *Commonwealth v. Anneski*, 525 A.2d 373 (Pa.Super. 1987), we overturned, based upon a weight claim, a terroristic threats conviction. The following facts informed that decision. School children used a narrow lane to walk to a bus stop. The victim of the threat, who filed a private criminal complaint, used the road and complained about the children blocking it. On the day of the incident in question, the complainant struck a backpack of one of the children with her car. Believing that her children were in danger of being hit by the complainant's car, the defendant, in anger, confronted the complainant and told her that, if she ran into the children again, the defendant would get a gun and use it. We concluded that, under the circumstances in question, the defendant did not have the intent to terrorize. We noted that the defendant's threats were conditional and were made during a heated "perhaps hysterical, argument between neighbors." *Id*. at 376.

On the other hand, in *Commonwealth v. Fenton*, 750 A.2d 863 (Pa.Super. 2000), we upheld a conviction for terroristic threats under the

following circumstances. Fenton was angry over the handling of an insurance claim, and called his insurance adjuster. For seven to ten minutes, Fenton threatened to kill various people. Fenton specifically said he was going to shoot everyone in the insurance agent's office. Fenton also told his victim to "keep his doors locked, and that he would kill until he was killed himself." *Id*. at 865. Fenton told the insurance agent that he was going to shoot off the head of a Congressman's aide and go to a newspaper with guns blazing. In closing, Fenton told the adjustor, he "didn't know what might happen if this thing got started," and that "it may not happen today or tomorrow, but it would happen." *Id*. at 865. The insurance adjustor was in fear and telephoned police immediately after the tirade.

We noted in *Fenton* that the situation had been festering over several months, which gave the defendant time for reflection about what he intended to say to the insurance adjustor. We characterized his threats as "premeditated and deliberate" rather than a non-reflective spur-of-the-moment tirade. We concluded that the threats were "neither transitory nor unthinking" and therefore made with the intent to terrorize the insurance adjustor. *Id*.

Likewise, in *Walker*, *supra*, we rejected a challenge to the sufficiency of the proof supporting an intent to terrorize. Therein, Walker, who was HIV positive, dug his fingernails into his parole officer, who had arrested Walker. Walker then said, "I have open cuts on my hands. Life is short. I am taking

you with me." ***Walker***, ***supra*** at 1001. The parole officer was aware that Walker was HIV positive and, fearing that he had contracted that disease, was repeatedly tested over a six month period.

We conclude that the present case is analogous to ***Walker*** and ***Fenton***. The fact that Appellant was angry with her tenants for their behavior and nonpayment of rent does not, standing alone, prove that she lacked the intent to terrorize. ***Walker***, ***supra***. The situation, according to Appellant, had been festering over a long period. Appellant threatened to kill Mr. Robinson, Samantha, Timothy, and two young children. She then evidenced a clear intent to terrorize those people when she went into her bedroom and retrieved a gun, which she proceeded to waive around as Mr. Robinson scrambled to leave the home with his children. Appellant was pointing the gun at Samantha when Adrianna intervened.

Appellant did not merely engage in a verbal threat, as in ***Kidd*** and ***Anneski***. Since she possessed a firearm, Appellant had the present ability to complete her threats to kill Mr. Robinson and Samantha. Samantha left the home barefooted and in shorts during the height of winter. Mr. Robinson fled the premises without his belongings. His two-year-old daughter was traumatized by witnessing Appellant attempt to point a gun at her and her father while threatening to kill them.

We therefore hold that the evidence was sufficient to support the factfinder's determination that Appellant intended to terrorize Mr. Robinson

and Samantha and that it supported the single count of terroristic threats at issue herein. ***Commonwealth v. Hudgens***, 582 A.2d 1352, 1358 (Pa.Super. 1990) (ruling that evidence was sufficient to support intent to terrorize victim when defendant threatened to "stick the victim with the sword" that the defendant was holding in his hand).

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>11/9/2015</u>