COMMONWEALTH of Pennsylvania,
Appellee,

v.

Donald FENTON, Appellant.

Superior Court of Pennsylvania.

Argued Sept. 21, 1999.
Filed April 3, 2000.

Richard M. Corcoran, Public Defender, Ebensburg, for appellant.

Marianne E, Kreisher, Deputy Atty. Gen., Harrisburg, for Com., appellee.

Before EAKIN, LALLY–GREEN and BROSKY, JJ.

EAKIN, J.:

¶ 1 Donald Fenton appeals from the judgment of sentence entered after a jury convicted him of terroristic threats and harassment by communication or address. We affirm in part and reverse in part.

¶ 2 On December 3, 1997, appellant phoned Randy Leventry, an insurance adjuster handling appellant's truck repair claim. Appellant complained about the repair, then made the threats that led to his conviction. Appellant stated he had a gun and bullets and was going to start killing people, that he would kill the people at Laurel Ford, where his truck was being repaired, that he was "going to shoot [Congressman] Murtha's fucking head off" and would "shoot Mr. Hugya's [Congressman Murtha's aide] fucking head off." He stated he was going to the Tribune–Democrat, a local newspaper, with guns blazing, that he would kill all the Erie Insurance employees, that Mr. Leventry should keep his doors locked, and that he would kill until he was killed himself. Appellant stated Congressman Murtha and Hugya were conspiring with Erie Insurance and the newspaper to ruin him, that Murtha had stolen his ideas for the economic recovery of Johnstown and was planning to have appellant killed or cause him to commit suicide. Appellant said the government was against the people, who had to take things into their own hands, that Timothy

McVeigh was his hero, and that if the government declared war on him, he would take a body count. He told Mr. Leventry to keep his doors locked, because he "didn't know what might happen if this thing got started," and that it may not happen today or tomorrow, but it would happen.

¶ 3 Understandably concerned, Mr. Leventry stayed on the phone because he was afraid hanging up would exacerbate the situation. He took notes documenting the content of the call, which lasted seven to ten minutes. In the end, he thanked appellant for calling, hung up and immediately called his manager and the police.

¶ 4 A jury convicted appellant of terroristic threats and harassment by communication. He was sentenced to five years probation for terroristic threats and a concurrent three to twelve months incarceration for harassment. As a condition of probation, appellant was ordered to have no contact or communication with Mr. Leventry and his family, the Tribune–Democrat, Congressman Murtha and his staff, and Laurel Ford.

¶ 5 In this appeal, appellant contends the trial court erred in denying his motions to dismiss for insufficiency of evidence. He also claims the prohibition of contact is an illegal sentence that unduly restricts his freedom.

■ ¶ 6 In reviewing a challenge to the sufficiency of the evidence, we "must determine whether, viewing the evidence in the light most favorable to the Commonwealth as verdict winner, together with all reasonable inferences therefrom, the trier of fact could have found that each and every element of the crimes charged was established beyond a reasonable doubt." *Commonwealth v. Lytle*, 444 Pa.Super. 126, 663 A.2d 707, 708 (1995).

■ ¶ 7 To be found guilty of terroristic threats, a person must "threaten[ ] to commit any crime of violence with [the] intent to terrorize another or ... in reckless disregard of the risk of causing such ter-

ror...." 18 Pa.C.S. § 2706. " '[N]either the ability to carry out the threat nor a belief by the person threatened that it will be carried out is an essential element of the crime.' " *Commonwealth v. Hudgens*, 400 Pa.Super. 79, 582 A.2d 1352, 1358 (1990) (quoting *Commonwealth v. Anneski*, 362 Pa.Super. 580, 525 A.2d 373, 376 (1987), *appeal denied*, 516 Pa. 621, 532 A.2d 19 (1987)). "Rather, the harm sought to be prevented by the statute is the psychological distress that follows from an invasion of another's sense of personal security." *Commonwealth v. Tizer*, 454 Pa.Super. 1, 684 A.2d 597, 600 (1996) (citing *Hudgens*, at 1358).

■ ¶ 8 The defense conceded appellant threatened to commit a crime of violence, satisfying the first element of terroristic threats. However, appellant contends his statements were not made with the intent to terrorize; rather, he says, they were the product of transitory anger, and as such do not satisfy the second element of the crime. Appellant correctly notes Section 2706 is not meant to penalize "mere spur-of-the-moment threats which result from anger." 18 Pa.C.S. § 2706, Official Comment—1972; *see also Tizer*, *supra*; *Commonwealth v. Campbell*, 425 Pa.Super. 514, 625 A.2d 1215, 1218 (1993).

¶ 9 We cannot agree with appellant's characterization. The problems which led to the phone call occurred over several months; appellant clearly spent a long time reflecting upon his frustrations, and his threats cannot be characterized as less than premeditated and deliberate. Their breadth and the sweeping choice of those threatened are not reflective of any "spur-of-the-moment" frustration. The threats went beyond Mr. Leventry and his claim, demonstrating they were neither transitory nor unthinking.

■ ¶ 10 Being angry does not render a person incapable of forming the intent to terrorize. Appellant's demonstration of festering anger showed an ample desire to terrify by means of threats of violence.

By stating he planned to kill and had the means to do it, then telling Mr. Leventry to lock his door, appellant acted with reckless disregard for the fact that he would, of necessity, evoke terror. Mr. Leventry "was subjected to the precise type of psychological harm and impairment of personal security which the statute seeks to prevent." [1] *Hudgens*, at 1359. Thus, the evidence supports the jury's finding.

¶ 11 The harassment by communication or address statute provides:

(a) Offense defined.—A person commits a misdemeanor of the third degree if, with intent to harass another, he:

(1) makes a telephone call without intent of legitimate communication or addresses to or about such other person any *lewd, lascivious or indecent* words or language or anonymously telephones another person repeatedly; or

(2) makes repeated communications anonymously or at extremely inconvenient hours, or in offensively coarse language.

18 Pa.C.S. § 5504(a) (emphasis added).

¶ 12 The underlying intent to harass is certainly made out. Because there was only one offending call, not repeated communications, appellant was charged under subsection (a)(1). While the original call had a legitimate purpose, that subsection condemns the use of "lewd, lascivious or indecent" language. The jury, as well as the trial court, concluded appellant's threat to shoot the "fucking head" off Congressman Murtha and his aide was "lewd, lascivious or indecent" within the meaning of subsection (a)(1). We must disagree.

¶ 13 "Lewd" acts involve "sexuality or nudity in public." *See, e.g., Commonwealth v. Williams*, 394 Pa.Super. 90, 574 A.2d 1161, 1163 (1990), and the discussion of the term therein. The common meaning of "lascivious" is "lewd" or "lustful." "Indecent," while less sexually specific, is generally defined as "grossly unseemly or offensive to manners or morals." Webster's New Collegiate Dictionary, 583 (G. & C. Merriam Co., 1977). As used in the Crimes Code, "indecent" refers to acts or behavior of a sexually offensive nature; *see, e.g.*, 18 Pa.C.S. § 3101 (indecent contact is the touching of sexual or intimate body parts). Indecent exposure, 18 Pa. C.S. § 3127, involves exposure of the genitalia. All three words connote or pertain to matters of a sexual and salacious nature.

¶ 14 In contrast, subsection (a)(2) targets "offensively coarse" language. "Coarse" is commonly understood to mean "crude or unrefined in taste, manners, or language." Webster's New Collegiate Dictionary, 214 (G. & C. Merriam Co., 1977). The fact "coarse" is included in a separate subsection bespeaks a distinguishing of the sexual word from the merely coarse word. Thus, to be "lewd, lascivious, or indecent" within the meaning of subsection (a)(1), the words or language must be of a sexual nature, as opposed to being merely "offensively coarse." Put another way, harassment by "merely coarse" language will constitute a crime only in repeated communications (subsection (a)(2)); however, a single incident may suffice if the harassing language is sexual in nature (subsection (a)(1)).

¶ 15 While appellant's use of the "F word" certainly wins him no praise for eloquence or intelligence, we cannot conclude that, in the context in which it was used, it constituted sexually explicit language. One need not cuss like the proverbial sailor to know that in today's America the "F word" is used much too freely, but very creatively. Anyone attending an R-rated movie has heard the word used to describe the good, the bad and the ugly.

---

1. Although proof of actual terror is not required, Mr. Leventry was duly made afraid. He warned his wife and children of the threats, instructed them how to use his gun, and alerted his supervisor and police to the threats. He also installed a home security system as a direct result of this call.

It is used to express every known emotion from abject joy to abject fear and misery. It may be used as a verb, a noun, an adverb, an interjection, an epithet or expletive, and herein as an emphatic adjective.[2] Particularly as a noun or verb, the word may describe an act or intention which the listener could find "lewd, lascivious or indecent," but clearly the word is not always descriptive of an act of sex.[3]

¶ 16 Here, appellant used the word as an adjective, a term describing a noun, in this case the heads of those he threatened to shoot. The language was clearly meant to be emphatic, even coarse, and in this appellant succeeded. However, the only reasonable perception of the angry adjective, *in context*, had nothing to do with sex; hence, it is not "lewd, lascivious, or indecent" within the meaning of subsection (a)(1), and appellant's conviction of this crime must be reversed.

¶ 17 Finally, appellant claims the condition of his probation which forbids him from having contact with certain persons and entities constitutes an illegal sentence. Specifically, appellant argues that none of the individuals whom he is prohibited from contacting, with the exception of Mr. Leventry, were victims in this case. He further argues the prohibition from contact with the local newspaper and his congressman unduly restricts his freedom of speech, thereby impinging on his constitutional rights.[4]

¶ 18 Sentencing is within the sound discretion of the trial court, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. *Commonwealth v. Johnson*, 446 Pa.Super. 192, 666 A.2d 690, 693 (1995). When a sentence is within the guidelines, as appellant's is, we may only reverse if the sentence is clearly unreasonable. *Koren*, at 1208 (citing 42 Pa.C.S. § 9781(c)(2)).

¶ 19 In imposing a probationary sentence, the trial court was required to follow 42 Pa.C.S. Section 9754, which sets out specific conditions the court may impose. Section 9754(c)(13) permits the court to require the defendant "[t]o satisfy any other conditions reasonably related to the rehabilitation of the defendant and not unduly restrictive of his liberty or incompatible with his freedom of conscience." 42 Pa. C.S. § 9754(c)(13). Appellant claims the "no contact" conditions of his sentence violate this subsection.

A probation order is unique and individualized. It is constructed as an alternative to imprisonment and is designed to rehabilitate a criminal defendant while still preserving the rights of law-abiding citizens to be secure in their persons and property. When conditions are placed on probation orders they are formulated to insure or assist a defendant in leading a law-abiding life.

*Koren*, at 1208 (citations omitted).

¶ 20 During the course of his conversation with Mr. Leventry, appellant threat-

---

2. Books have been written on the varied uses of the word. *See, e.g., The F Word*, edited by Jesse Sheidlower (Random House, 1995, 1999).

3. Society has long deleted or euphemized coarse words because they are offensive, but not necessarily because they are sexual. Over a hundred years ago, in the opera "H.M.S. Pinafore," Gilbert and Sullivan satirized the manners of the time, which apparently extended to sanitizing the word "damn": "Though 'bother it' I may occasionally say, I never use a big, big D."

4. This involves the discretionary aspects of sentencing. *Commonwealth v. Hermanson*, 449 Pa.Super. 443, 674 A.2d 281, 282 (1996)

(challenge to conditions of probation challenges discretionary aspects of sentencing); *Commonwealth v. Koren*, 435 Pa.Super. 499, 646 A.2d 1205, 1207 (1994) (same). Appellant has included in his brief a concise statement of reasons relied upon for allowance of appeal. *See* Pa.R.A.P. 2119(f) and *Commonwealth v. Tuladziecki*, 513 Pa. 508, 522 A.2d 17 (1987). Further, his claim raises a substantial question that the sentence is inappropriate under the Sentencing Code. *See Hermanson, supra* (allegation that sentence was inconsistent with specific provisions of Sentencing Code raises a substantial question). Accordingly, we will review the merits of this claim.

ened to kill or inflict acts of violence. The fact that Mr. Leventry was the only individual who directly heard the terrorizing words does not make the no-contact condition unreasonable. Having been named as specific targets in the rampage appellant threatened, these people and organizations were properly within the ambit of the trial court's concern:

> [T]he trial judge has a duty to protect the rights of all parties who may have been victims or potential victims of the Defendant's actions. Due to the nature of the threats made by the Defendant, and the threats that he would kill persons at Congressman Murtha's office, at Laurel Ford and at the Tribune–Democrat, the court felt it necessary to prohibit him from contacting these persons. The court considered not only the rights of these parties, but also the interests of the Defendant himself. In order to avoid any future entanglements with the law, the court thought it best that the Defendant stay away from all those individuals he had threatened.

Trial Court Opinion, 1/6/99, at 7.

¶ 21 The restrictive conditions of appellant's probation were aimed not only at protecting certain people from appellant's menace, but also at "assist[ing] [appellant] in leading a law-abiding life." *Koren*, at 1208. By restricting appellant's contact with the individuals and institutions which were the targets of his threats, the trial court was insuring that appellant would not find himself in trouble again because of his volatile reaction to these people and entities. Appellant's threats of mass carnage are made credible by the nightly news with disturbing regularity, and cannot be taken lightly. Given the level of bile displayed, the learned trial court was not bound to believe appellant's use of emphatic language would be his only outlet, and we find nothing unreasonable in the use of these minimal safeguards.

¶ 22 Contrary to appellant's contention, the prohibition against contact with his congressman and the local news-

paper does not unduly restrict his freedom of speech. "[A] person placed on probation 'does not enjoy the full panoply of constitutional rights otherwise enjoyed by those who [have] not run afoul of the law.' A probation order with conditions placed on it will to some extent always restrict a person's freedom." *Id.*, at 1209 (citations omitted). These restrictions do not bar appellant from expressing his views in an appropriate manner in the appropriate forum. Writing one's congressman or newspaper and expressing one's displeasure with the current political system is one thing; contacting such officials after one has credibly and categorically threatened their lives is another. The former falls within the ambit of the First Amendment's protection; the latter constitutes a criminal act, which is clearly not constitutionally protected behavior.

¶ 23 Public officials, newspapers, and even insurance adjusters, must anticipate being the target of vigorous criticism; they do not have to be the very literal target of threats to shoot them. Likewise, they need not have contact with those who choose to make such threats. Appellant's decision to threaten forfeited his right to unfettered access to certain people and institutions; these people have rights as well, and we find no abuse of discretion by the trial court in imposing these conditions. There are other outlets for appellant's legitimate expressions of view.

¶ 24 Accordingly, the judgment of sentence is affirmed with respect to terroristic threats, and reversed with respect to harassment by communication. Because we cannot determine whether the trial court's sentencing scheme would have been different without the harassment conviction, we remand for resentencing on the terroristic threats charge. *See Commonwealth v. Neidig*, 340 Pa.Super. 217, 489 A.2d 921, 925 (1985); *Commonwealth v. Davenport*, 255 Pa.Super. 131, 386 A.2d 543 (1978) (usual procedure for resentencing where one of multiple convictions is

reversed on appeal is to remand for resentencing).

¶ 25 Judgment of sentence affirmed in part, reversed in part; case remanded for resentencing. Jurisdiction relinquished.

¶ 26 BROSKY, J., files a concurring opinion.

BROSKY, J., concurring.

¶ 1 I fully agree with the majority Opinion. I write separately to point out that our decision today is consistent with case law concerning whether an utterance of the "F" word is an obscene statement for purposes of the crime of disorderly conduct, 18 Pa.C.S.A. § 5503(a)(3). With regard to the issue of whether Appellant's usage of the "F" word amounts to lewd, lascivious, or indecent words for purposes of the crime of harassment by communication, I believe that the cases concerning the disorderly conduct statute are relevant and instructive. *See Commonwealth v. Lobiondo*, 501 Pa. 599, 462 A.2d 662, 664 (1978) (stating that sections of the Crimes Code are necessarily interrelated, and should be read and construed as an entirety). Indeed, the cases concerning whether usage of the "F" word amounts to disorderly conduct bolster our interpretation of the harassment by communication statute as to the usage of language relating to sex.

¶ 2 Sections 5503 and 5504 of the Crimes Code were both adopted by the Legislature on December 6, 1972 and became effective on June 6, 1973. In fact, both criminal statutes were part of Public Law 1482, No. 334, Section 1. Section 5504(a)(1), addressed by the majority Opinion, makes criminal the conduct of a person who, with the intent to harass another person, "addresses to or about such other person any lewd, lascivious or indecent words or language".... 18 Pa.C.S.A. § 5504(a)(1). Section 5504(a)(2) makes criminal the conduct of a person who, with the intent to harass another person, makes "repeated communications ... in offensively coarse language". 18 Pa.C.S.A. § 5504(a)(2).

¶ 3 Section 5503 defines the offense of disorderly conduct, in pertinent part, as follows:

(a) Offense defined.—A person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he:

(1) engages in fighting or threatening, or in violent or tumultuous behavior;

. . .

(3) uses obscene language, or makes an obscene gesture;

(4) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor.

18 Pa.C.S.A. § 5503.

¶ 4 The majority Opinion astutely observes that the terms "lewd, lascivious, and indecent", used in section 5504(a)(1), all connote or pertain to matters of a sexual and salacious nature. I would observe that, likewise, the term "obscene" used in section 5503(a)(3) has the common meaning of being designed to incite lust or depravity. *See* Webster's Collegiate Dictionary, 802 (Merriam–Webster, Inc., 1993). Thus, the term "obscene" also pertains to matters that are of a sexual and salacious nature.

¶ 5 On several occasions in the past, this Court and our Supreme Court have considered whether language is "obscene" so as to render a person guilty of having uttered obscene language for purposes of supporting a disorderly conduct conviction. The test that has evolved is one that is used for gauging whether language is "obscene" or protected as free speech for purposes of the First Amendment to the United States Constitution.

¶ 6 Significantly, in *Commonwealth v. Pringle*, 304 Pa.Super. 67, 450 A.2d 103 (1982), a panel of this Court addressed the question of whether the appellant therein, Paula Pringle, was guilty of committing disorderly conduct pursuant to section 5503(a)(3), regarding the use of obscene

language. Pringle repeatedly shouted "goddamn fucking pigs" at officers in protest of a friend's arrest as a large crowd gathered at the scene. Quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–2, 62 S.Ct. 766, 769, 86 L.Ed. 1031, 1034–35 (1942), we recognized that there is certain speech, including obscene language and fighting words, that is not accorded Constitutional protection under the First Amendment to the United States Constitution.

¶ 7 The *Pringle* Court examined the United States Supreme Court precedent on whether the use of the word "fuck" under certain instances was protected as free speech. *Pringle*, 450 A.2d at 106 (citing *Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971)) (where the defendant was convicted for disturbance of the peace for wearing a jacket bearing the inscription, "Fuck the Draft"); and *Hess v. Indiana*, 414 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973) (where the defendant was convicted for a disturbance because he stated, "We'll take the fucking street later" during an antiwar demonstration). The *Pringle* Court rejected the Supreme Court cases as inapplicable to the situation before it, where the appellant had been making epithets at police officers. This Court held that, although in other contexts, the word "fuck" had to carry a sexual context in order to be obscene, in the circumstances of the case before the court, where Pringle had called the police officers "goddamn fucking pigs", he had used "obscene" language within the context of section 5503(a)(3), without need for resort to the sexual content of the words. The *Pringle* Court further concluded that, even if the words were not obscene, they were "fighting words", *i.e.*, those words which by their very utterance inflict injury or tend to incite an immediate breach of the peace. Therefore, the *Pringle* Court reasoned that the appellant, in shouting these words at police in a crowd as they carried out their duties, had created a risk of public inconvenience, annoyance, alarm, and the inciting of lawless behavior.

¶ 8 Subsequently, in *Commonwealth v. Bryner*, 438 Pa.Super. 473, 652 A.2d 909 (1995), a panel of this Court attempted to refine the decision in *Pringle* so that a test could be devised for determining whether language is obscene for purposes of section 5503(a)(3) or is protected speech under the First Amendment. The *Bryner* Court considered whether an appellant who shouted, "Go to hell, Betsy", was properly convicted of a disorderly conduct summary offense under section 5503(a)(3). In *Bryner*, the appellant therein, Brady L. Bryner, was standing near the rear of an auction building voicing his views about a teacher strike. Several hundred people were in attendance at the auction when Betsy Long, one of the owners of the auction building, asked Bryner to leave the building. He then shouted the statement in question.

¶ 9 In determining whether Bryner's utterance constituted obscene language under section 5503(a)(3), the *Bryner* Court adopted the test set forth in *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), pertaining to whether materials are obscene or protected by the First Amendment. That test is:

(a) whether "the average person, applying contemporary community standards" would find that the work, taken as a whole, appeals to the prurient interest, (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law, and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

*Bryner*, 652 A.2d at 912 (*quoting Miller*, 413 U.S. at 24, 93 S.Ct. at 2615). This Court determined that the language used by Bryner was not obscene under the *Miller* test. Departing from the decision in *Pringle*, once determining that the utterance was not obscene, the *Bryner* Court did not go on to examine whether the

statement was "fighting words", unprotected as free speech. The *Bryner* Court noted that there was no need to consider whether Bryner's words were "fighting words", since that type of language is not at issue under section 5503(a)(3). *Bryner*, 652 A.2d at 912, n. 4. This analysis seems to put an end to the analysis conducted in *Pringle*.

¶ 10 Following *Bryner*, the federal district court for the Middle District in *Brockway v. Shepherd*, 942 F.Supp. 1012, 1016 (M.D.Pa.1996), addressed the question of whether the appellant therein, Louis Brockway, violated section 5503(a)(3) by making an obscene gesture, the proverbial "middle finger", after a vehicle stop.[5] In ruling on this question, the court relied on *Bryner* and the *Miller* standard adopted in that case. The *Brockway* Court observed that there are times when conduct using a base term for sex may be intended to express disrespect for someone and to offend that person, yet not amount to offensive communication that appeals to the prurient interest. The court stated: "It would be a rare person who would be 'turned on' by the display of a middle finger or the language it represents...." *Brockway*, 942 F.Supp. at 1015. In interpreting section 5503(a)(3), the court reasoned that the intent behind the crime of disorderly conduct was to prevent people from using gestures or language in a way that would engender public turmoil. The *Brockway* Court observed that language or a gesture might support a charge of disorderly conduct under section 5503(a)(1) or (4), depending on the context. Since Brockway was charged not with section 5503(a)(1) or (4) but section 5503(a)(3), the court ruled that he was improperly arrested for making the offensive gesture, as there was no showing that it was ob-

scene for purposes of the First Amendment.

¶ 11 Later, in *McDermott*, 971 F.Supp. 939 (E.D.Pa.1997), the federal District Court for the Eastern District of Pennsylvania applied this Court's decision in *Bryner* to its analysis of whether the appellant, Michael McDermott, had committed a violation of subsection 5503(a)(3) of the Crimes Code.[6] McDermott, a First Class Petty Officer in the United States Navy, had been drinking one night, and, when rousted from his car by Naval Security Officers, uttered profanities describing the rousting as "bullshit", and allegedly saying, "I'm not fucking going anywhere". The Eastern District Court found the language uttered by McDermott, although obscene in everyday parlance, not obscene under the test adopted in *Bryner*. Furthermore, the court ruled that the language used by McDermott was not "fighting words", in that there was no evidence that he sought to incite others to prevent his arrest. Therefore, the *McDermott* Court, finding the language distasteful but not criminal, reversed the judgment of conviction.

¶ 12 Subsequently, in *Hock*, our Pennsylvania Supreme Court considered the question of whether a single profane remark directed at a police officer was sufficient to support a conviction of disorderly conduct. The appellant, Kelly Jo Hock, uttered, "Fuck you, asshole," in a normal tone of voice after a police officer cited her for driving under a suspended license. The only persons present were the police officer, who was seated behind the wheel of his cruiser, and the appellant. The *Hock* court concluded that Hock's utterance was not "fighting words", since, under the circumstances, a trier of fact could not reasonably find that her comment risked an immediate breach of the peace.

---

**5.** Although we are not bound by decisions of federal courts inferior to the United States Supreme Court, we may look to them for guidance in interpretation of federal case law. *Commonwealth v. Clark*, 551 Pa. 258, 710 A.2d 31, 39 (1998).

**6.** This state offense was adopted for use in the federal case.

The Supreme Court found that the remark did not constitute disorderly conduct under section 5503(a)(1). The particular subsection of section 5503(a) with which Hock was charged is not clear from the opinion. However, Justice Castille noted in his dissent that the words uttered by Hock did not fit the definition of "obscene" under section 5503(a)(3) under the *Miller* test adopted in *Bryner*, and that the Court was analyzing the behavior strictly under section 5503(a)(1). *Commonwealth v. Hock*, 556 Pa. 409, 728 A.2d 943, 947 n. 1 (1999) (Castille, J., dissenting).

¶ 13 In the instant appeal, Appellant was charged not with a violation of section 5503 of the Crimes Code but a violation of section 5504(a). I would find it appropriate for this Court to apply the same test for whether a communication is "lewd, lascivious or indecent" under section 5504(a)(1) that has been applied in determining whether an utterance or gesture is "obscene" under section 5503(a)(3), *i.e.*, the *Bryner* test. Consistent with the case law discussed above, and applying the test articulated in *Bryner*, I would find that the statement allegedly uttered by Appellant to Mr. Leventry, regarding shooting off person's "fucking heads", while uncivil, is not sexual in nature and would not have aroused Mr. Leventry's prurient interests. Thus, Appellant's statement was protected speech. Although Appellant most likely intended to be disparaging with his use of the "F'" word, his statement here was no different from Hock's use of the word in the *Hock* case: the "F'" word was privately uttered and was in no way sexually evocative.

¶ 14 I find Appellant's attitude toward his legislator and the legislator's staff, as reflected in Appellant's communication to Mr. Leventry, alarming. I wholeheartedly agree with the majority that Appellant was guilty of making terroristic threats for his statement directed toward Mr. Leventry,

Congressman Murtha and his aide, as well as toward the other people involved in repairing Appellant's truck. Certainly, Appellant is not to be applauded for use of the "F'" word in making these terroristic threats. While this Court is sensitive to the social affront to which Mr. Leventry was subjected, I must agree, however, that the evidence was insufficient to establish that Appellant's loathsome behavior amounted to harassment by communication under section 5504(a)(1).[7] Thus, I concur in the majority's Opinion.

---

7. Moreover, I agree with the majority's conclusion that Appellant's conduct was not a violation of section 5504(a)(2), as there were no repeated communications in offensively coarse language by him.