**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MATTHEW J. ZINSER | |
| Appellant | No. 707 MDA 2016 |

Appeal from the Judgment of Sentence April 12, 2016
In the Court of Common Pleas of Dauphin County
Criminal Division at No(s): CP-22-CR-0004820-2015

BEFORE:  OTT, J., DUBOW, J., and PLATT, J.[*]

MEMORANDUM BY OTT, J.:                    **FILED FEBRUARY 09, 2017**

Matthew J. Zinser appeals from the judgment of sentence imposed on April 12, 2016, in the Court of Common Pleas of Dauphin County.  A jury found Zinser guilty of terroristic threats and criminal mischief.[1]  On the charge of terroristic threats, the trial court sentenced Zinser to not less than 9 months nor more than 23 months with immediate eligibility for work release.  On the charge of criminal mischief, the trial court imposed a concurrent term of 12 months' county probation.  The sole issue raised in

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] **See** 18 Pa.C.S. §§ 2706(a)(1), and 3304(a)(2), respectively.  The jury found Zinser not guilty of simple assault, 18 Pa.C.S. § 2701(a)(1).

this appeal is a challenge to the sufficiency of the evidence to sustain the conviction for terroristic threats. Based upon the following, we affirm.

The trial court summarized the evidence presented at trial, as follows:

The Commonwealth's first witness was Andrea Todd ("victim"). Ms. Todd testified to her current relationship with [Zinser] and that they are engaged.[3]

_____

[3] Transcript of Proceedings, Jury Trial, March 15-17, 2016, page 24 (hereinafter, "N.T. ____").

_____

On the date of the incident Ms. Todd, [Zinser], and her daughter were all living at the same house. (N.T. 25) The incident started on the night of July 3[, 2015,] continuing until the morning of July 4, 2015[,] when only Ms. Todd and [Zinser] were in the house. (N.T. 25-26) Ms. Todd testified that she came home from work around 9 [p.m.] and started drinking. (N.T. 26) [Zinser] came home from work around 11 or 12 [p.m.] and started drinking. (N.T. 26) Ms. Todd and [Zinser] got into an argument, but Ms. Todd could not remember the reason for the argument. (N.T. 27) The argument started in the living room and was at this point only verbal, but then later turned physical in the bathroom. Ms. Todd relayed the following about the incident:

We were arguing over what we were arguing over, and he kind of just, you know, -- I kind of, like, got in his face. And he kind of, like got me out of the way and then, like, said something threateningly, but didn't like, actually threaten to do anything. Just said, like, what he could do, which you know, like –

(N.T. 27)

Ms. Todd clarified that she got in his face by going towards him in an argumentative way. (N.T. 28) When asked if, during this altercation, [Zinser's] body had any contact with hers, Ms. Todd explained that [Zinser] and she just bumped into each other.

- 2 -

(N.T. 28-29) Ms. Todd testified that she did not remember giving a statement to police.[4] (N.T. 28)

_____

[4] The audio recording of the statement given by Ms. Todd to the Police was introduced as Commonwealth Exhibit 1 and played for the jury. N.T. 33.

_____

Ms. Todd testified that [Zinser] put his hand by her throat in the bathroom and that he made a threat of something he could do. (N.T. 29) Ms. Todd stated the threat was:

Like, I could just kill you, but, like, saying that in just, like, an angry way; not, like, actually with intent; just saying it. Like stuff people say when they get mad, not like an actual threat to do it.

(N.T. 29)

After the bathroom incident, Ms. Todd went to bed around 12:30 or 1 [a.m.] but she is not certain due to intoxication. (N.T. 30) Ms. Todd stated she was awakened by [Zinser] attempting to get her phone from underneath her pillow. (N.T. 30) A struggle ensued in which [Zinser] refused to return the phone instead asking for the passcode which Ms. Todd refused to give up. (N.T. 31-32) Ms. Todd testified that she got on his back trying to get the phone back and that [Zinser] tried to get her off by "push[ing] his elbow … push[ing] his forearms back." (N.T. 32) Ms. Todd stated that [Zinser] did not have his hands near her neck during this phone incident. (N.T. 32) Ms. Todd testified that she left the house following this struggle fearing an escalation even though she did not want to leave. (N.T. 34) Ms. Todd went to her mother's house where she explained what happened and called the police. (N.T. 35) Ms. Todd confirmed the broken state of her phone as well as a photograph of scratch marks on her body the date of the incident.[5] (N.T. 38)

_____

[5] Said photographs were admitted into evidence as Commonwealth's Exhibits 4, 5 and 6.

_____

On cross-examination, Ms. Todd explained that she had consumed alcohol, but could not remember the exact amount, and had taken ZzzQuil in order to sleep. (N.T. 43) Ms. Todd asserted again that she did not remember giving the statement to police and that the statement is incorrect involving the allegations against [Zinser]. (N.T. 43) There had been a history of trust issues relating to infidelity stemming from both sides in the relationship. (N.T. 44) Ms. Todd explained her unsuccessful attempts to rescind her statement in order to clear the charges against [Zinser]. (N.T. 45-46) Ms. Todd confirmed that the statement uttered by [Zinser] was "I could just kill you." (N.T. 50) Ms. Todd agreed with defense counsel's characterization of the statement as more of a swearing, or a frustration, or almost an "I-hate-you-so-much-I-wish-you-would-just-go-away" statement. (N.T. 50) Ms. Todd testified that [Zinser] did not threaten or cause her fear. (N.T. 51) Ms. Todd agreed that her fear grew from her anger that [Zinser] broke her phone and from her fear of an escalation. (N.T. 51)

The Commonwealth's second and final witness was Officer Steven Wertz, the responding officer to call the 911 call. (N.T. 58-59) Officer Wertz testified that Ms. Todd's earlier testimony was inconsistent with the statement that she had given on the night of the incident. (N.T. 59) Officer Wertz responded to Ms. Todd's mother's residence, after listening to Ms. Todd, Officer Wertz went to Ms. Todd and [Zinser's] residence. (N.T. 59-61) Officer Wertz observed redness and scratches on both sides of Ms. Todd's neck. (N.T. 60) Officer Wertz and his fellow officer found [Zinser] sleeping and lethargic and arrested him thereafter. (N.T. 62) After the arrest, Officer Wertz had recorded an audio of Ms. Todd recounting the incident. (N.T. 63) On cross-examination, defense counsel clarified with Officer Wertz three separate incidents of physical contact between Ms. Todd and [Zinser] that Ms. Todd described in the recorded statement. (N.T. 64-68)

The Defense's first witness was Deborah Blackstock, the mother of [Zinser]. (N.T. 80) Ms. Blackstock testified to conversations between herself and Ms. Todd after the incident. (N.T. 82) The conversations included a description of the events that were inconsistent with the recorded statement by police. (N.T. 84) Finally, Ms. Blackstock testified to her belief that after the phone conversation, Ms. Todd went to the police station in order to have the charges dropped. (N.T. 87) On cross-examination, Ms.

Blackstock stated that she was not present anytime during the incident and did not accompany Ms. Todd on her trip to the police station. (N.T. 88)

The Defense's last witness was [Zinser]. [Zinser] testified to trust issues related to infidelity in his and Ms. Todd's relationship. (N.T. 90-91) [Zinser] proceeded to give his version of the incident starting with an argument in the living room. (N.T. 93) [Zinser] says that he did not put his hands on Ms. Todd's throat or physically pinned her against the couch (N.T. 95). Waking up from a dream about Ms. Todd cheating, [Zinser] goes into the bedroom to take Ms. Todd's phone. (N.T. 95) [Zinser] then goes into the bathroom so as to avoid waking her up. (N.T. 95-96) Ms. Todd awakens and comes into the bathroom, asking for the phone back. (N.T. 96) [Zinser] took responsibility for destroying the phone by running it under water then throwing it on the ground thereafter. (N.T. 97) [Zinser] says that the physical contact between himself and Ms. Todd consisted of him keeping the phone away from Ms. Todd. (N.T. 98) [Zinser] testified that Ms. Todd took a good half hour getting dressed and pacing before leaving. (N.T. 100-01) Finally, [Zinser] testified that [Zinser] never choked, punched, or slapped Ms. Todd during the entire encounter. (N.T. 101) On cross-examination, Commonwealth confirmed the timeline of [Zinser's] testimony. (N.T. 101-02) Commonwealth concluded by asking about Ms. Todd's testimony that she had left right after the bathroom incident which runs inconsistent with [Zinser's] testimony that she took 30 minutes before leaving. (N.T. 102-03) [Zinser] responded to this inconsistency by stating Ms. Todd was a liar. (N.T. 103)

Trial Court Opinion, 8/8/2016, at 2-5.

As stated above, the jury convicted Zinser of terroristic threats and criminal mischief. Following sentencing, Zinser filed this timely appeal. [2]

_____

[2] Zinser timely complied with the order of the trial court to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal.

Zinser claims the evidence was insufficient to sustain his conviction for terroristic threats because "[t]he Commonwealth failed to prove [Zinser's] intent to terrorize another, where the statement was communicated in the course of a heated argument." Zinser's Brief at 9.

Our standard of review is well settled.

> In reviewing the sufficiency of the evidence, we must determine whether the evidence, and all reasonable inferences deducible therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish all of the elements of the offenses beyond a reasonable doubt.

**Commonwealth v. Martinez**, ___ A.3d ___, ___ [2016 PA Super 309] (Pa. Super. 2016) (citation omitted).

Under Section 2706 of the Crimes Code, a person commits the crime of terroristic threats "if the person communicates, either directly or indirectly, a threat to: … commit any crime of violence with intent to terrorize another[.]" 18 Pa.C.S. § 2706(a)(1).

For a defendant to be convicted of terroristic threats,

> "the Commonwealth must prove that 1) the defendant made a threat to commit a crime of violence, and 2) the threat was communicated with the intent to terrorize another or with reckless disregard for the risk of causing terror." **Commonwealth v. Tizer**, 454 Pa. Super. 1, 684 A.2d 597, 600 (1996). "Neither the ability to carry out the threat, nor a belief by the person threatened that the threat will be carried out, is an element of the offense." **In re J.H.**, 2002 PA Super 108, 797 A.2d 260, 262 (Pa. Super. 2002). "Rather, the harm sought to be prevented by the statute is the psychological distress that follows from an invasion of another's sense of personal security." **Tizer**, 684 A.2d at 600.

- 6 -

*Commonwealth v. Beasley*, 138 A.3d 39, 46 (Pa. Super. 2016), *appeal denied*, ___ A.3d ____ (Pa. 2016), *citing* *Commonwealth v. Reynolds*, 835 A.2d 720, 730 (Pa. Super. 2003).

The Official Comment to Section 2706 explains: "The purpose of this section is to impose criminal liability on persons who make threats which seriously impair personal security or public convenience. It is not intended by this section to penalize mere spur-of-the-moment threats which result from anger." 18 Pa.C.S. § 2706 Comment. "[T]he real issue [i]s whether the Commonwealth presented sufficient evidence to establish the required *mens rea*, not whether [Appellant] made the statements in the context of a heated discussion. Being angry does not render a person incapable of forming the intent to terrorize." *Commonwealth v. Walker*, 836 A.2d 999, 1001 (Pa. Super. 2003). We examine the totality of circumstances to determine if appellant had the necessary *mens rea.* *See Commonwealth v. Reynolds, supra*, 835 A.2d at 730.

Here, Zinser maintains his statement was the result of "transitory anger"[3] and therefore is not subject to criminal liability. Zinser argues:

> [Zinser], while inebriated, reacted to an emotionally charged situation, and blurted out a statement for the purpose of expressing frustration. The context surrounding [Zinser's] communication can be described as nothing other than a 'spur-of-the-moment' frustration, where the testimony presented was

---

[3] Zinser's Brief at 19.

that [Zinser's] anger was transitory. *See* [***Commonwealth v.***] ***Fenton***[, 750 A.2d 863 (Pa. Super. 2000)]. Ultimately, testimony presented showed that the tempers of both parties had flared, but that the anger was merely transitory, as evidenced by the fact that the argument was over within an hour of it having begun, as Ms. Todd was in bed by "12:30, 1 o'clock" [N.T., p. 30], as was [Zinser]. [N.T. p. 99]

The transitory nature of [Zinser's] anger was evidenced by the fact that he was not the initiator of the dispute, as well as the short duration of the dispute, and also the fact that although tempers were high, [Zinser] was ultimately able to remove himself from the situation and go to sleep. Furthermore, reviewing the testimony from the Commonwealth's own witness, [Zinser] uttered the communication, "I could just kill you," not with intent to terrorize Ms. Todd, but rather, "saying it in just … an angry way; not … actually with intent; just saying it. Like stuff people say when they get mad, not like an actual threat to do it." [N.T., p. 29].

In addition, unlike the fact pattern in ***Fenton***, [Zinser's] utterance was clearly not the result of a reflective decision, but rather would best be described as a breach of the peace. ….

Zinser's Brief at 17–18. In addition, Zinzer favorably compares his case to

***Commonwealth v. Kidd***, 442 A.2d 826 (Pa. Super. 1982), and

***Commonwealth v. Sullivan***, 409 A.2d 888 (Pa. Super. 1979), and

distinguishes ***Commonwealth v. Fenton***, 750 A.2d 863 (Pa. Super. 2000).

We are not persuaded by Zinser's argument.

***Kidd*** involved a defendant arrested for public drunkenness. As he was

being treated in the emergency room, and with his hands handcuffed behind

his back, the defendant shouted obscenities and yelled that he was going to

kill the police, specifically saying he would machine gun them if given a

chance. 442 A.2d at 827. On appeal, this Court held there was "insufficient

- 8 -

evidence that appellant, by his acts, intended to place the officers in a state of fear that agitates body and mind." *Id.  See also Commonwealth v. Walker, supra*, 836 A.2d at 1002 ("The defendant's statements in *Kidd* exemplify the sort of hyperbole from which the jury cannot properly infer, beyond a reasonable doubt, either an intent to terrorize or reckless disregard of the risk of causing terror.").

In *Sullivan*, the defendant telephoned the State Police Barracks, asking a trooper be sent to investigate his claim that the Sheriff of the County had assaulted the defendant's father.  Frustrated by the delay in the response, the defendant telephoned the barracks again and said, "If you don't want to send anybody down here, I have a .30-30 rifle and I'll come up there and blow that son of a bitch's head off." 409 A.2d at 888-889. The next morning the defendant encountered the Sheriff on the street by chance and during a loud verbal confrontation the defendant again threatened to kill the Sheriff.  *Id.* at 889.  The defendant was convicted of two counts of terroristic threats. On appeal, this Court reversed, finding that the defendant's threats were the product of his angry and agitated emotional state of mind, and that the record contained "no evidence that appellant, by his acts, intended to put the Sheriff into a state of 'extreme fear or fear that agitates body and mind[,]' …, and thus did not possess the 'intent to terrorize' required for conviction under section 2706."  *Id.* at 889-890 (citation omitted).

In contrast, in **Fenton**, the defendant, who was angry over an insurance claim, called Mr. Leventry, his insurance adjuster, and threatened to kill him and others during a seven to ten minute phone conversation.

> [The defendant] stated he had a gun and bullets and was going to start killing people, that he would kill the people at Laurel Ford, where his truck was being repaired, that he was "going to shoot [Congressman] Murtha's fucking head off" and would "shoot Mr. Hugya's [Congressman Murtha's aide] fucking head off." He stated he was going to the Tribune-Democrat, a local newspaper, with guns blazing, that he would kill all the Erie Insurance employees, that Mr. Leventry should keep his doors locked, and that he would kill until he was killed himself. [Defendant] stated Congressman Murtha and Hugya were conspiring with Erie Insurance and the newspaper to ruin him, that Murtha had stolen his ideas for the economic recovery of Johnstown and was planning to have appellant killed or cause him to commit suicide. [The defendant] said the government was against the people, who had to take things into their own hands, that Timothy McVeigh was his hero, and that if the government declared war on him, he would take a body count. He told Mr. Leventry to keep his doors locked, because he "didn't know what might happen if this thing got started," and that it may not happen today or tomorrow, but it would happen.

750 A.2d at 864-65. This Court concluded that these statements were sufficient to uphold the defendant's conviction for terroristic threats.

The **Fenton** Court reasoned the situation had been festering over several months, and the defendant had spent a long time reflecting upon his problems. This Court found the statements to be "premeditated and deliberate … and the sweeping choice of those threatened [was] not reflective of any "spur-of-the-moment" frustration." **Id.** at 865. Rather, the threats, which went beyond Mr. Leventry and the insurance claim, "were neither transitory nor unthinking." **Id.**

- 10 -

Based on our review of the record before this Court,[4] we find that the present case aligns with **Fenton**. As the trial court explained:

> The testimony of Ms. Todd established that there was a violent escalation of an argument that was recurrent in the relationship. Ms. Todd testified that, while in the bathroom, [Zinser] had his hands by her throat when he uttered the threat, "I could just kill you." The body positions of [Zinser] and Ms. Todd in conjunction of the content of the threat allowed the jury to find that [Zinser] harbored the requisite intent to terrorize Ms. Todd. Looking to [Zinser's] testimony, even though the sequence of events is inconsistent between the two testimonies, [Zinser] referenced his dream about Ms. Todd's infidelity as motivation for his actions to take the phone. The jury could deduce that because the problems (trust issues relating to infidelity) leading to the incident were present in the relationship before the night of the incident, [Zinser] had the requisite intent to terrorize Ms. Todd. This inference is similar to an inference that the Superior Court found reasonable in its decision in **Fenton**, explaining that anger does not render a person incapable of forming intent and due to the "festering anger" there was sufficient evidence for a jury to find the requisite *mens rea*. 750 A.2d at 865-866.

Trial Court Opinion, 8/8/2016, at 7 (emphasis omitted). In addition, the trial court rejected characterization of Zinser's statement as a "mere spur of the moment threat which resulted from anger." *Id.* at 8. The trial court opined: "Due to the recurring nature of the argument, in regards to infidelity, between [Zinser] and Ms. Todd, a jury could infer that this was not just a

_____

[4] The electronically filed certified record in this case includes the trial court record, jury trial and sentencing transcripts, and the trial court's opinion. The electronic record does not include the audio recording of the statement given by Ms. Todd, Commonwealth Exhibit 1, or photographs, Commonwealth's Exhibits 4, 5, and 6. However, as will be discussed, the testimony presented by the Commonwealth at Zinser's jury trial demonstrates sufficient evidence to sustain Zinser's conviction for terroristic threats.

spur-of-the-moment utterance but coming from a place of familiar feeling." *Id.* We agree with the trial court's analysis.

The evidence of record belies Zinser's position that the evidence was insufficient to demonstrate his intent to terrorize Ms. Todd. Ms. Todd testified Zinser put his hands by her throat while uttering the words, "I could just kill you." N.T., 3/15-17/2016, at 29. Later, according to Ms. Todd's testimony, Zinser took her phone and broke it. *See id.* at 30–31. Ms. Todd left the apartment and went to her mother's house. *Id.* at 34–35. After she got to her mother's house, she called police. *Id.* at 35. On cross-examination, Ms. Todd testified that in July of 2015 there were "trust issues going on" in the parties' relationship. *Id.* at 44. On re-direct examination, Ms. Todd answered affirmatively that she called 9-1-1 and "said [she had been] viciously attacked and he [Zinser] tried to kill her." *Id.* at 55. The responding officer testified he observed redness and scratches on both sides of the neck, and a scratch on the inside of her right bicep. *Id.* at 60. Zinser also admitted that he and Ms. Todd had "an on-going issue … about trust issues." *Id.* at 91. He testified on the night of the incident he awoke from a dream that Ms. Todd was "cheating." *Id.* at 95.

Applying our well established standard of review, and guided by the above-discussed case law, we conclude the Commonwealth's evidence, under the totality of the circumstances, was sufficient to support the jury's determination that Zinser acted in violation of 18 Pa.C.S. § 2706(a)(1).

Here, Zinser uttered a threat to commit a crime of violence, positioned his hands by Ms. Todd's neck, and confirmed his intent to terrorize by breaking her phone. Ms. Todd fled from the apartment to her mother's home and called police to report the incident. Zinser's sufficiency challenge based on his claim that his utterance was "spur of the moment" anger fails in light of this evidence and evidence that trust issues were festering in the parties' relationship. Accordingly, we affirm.

Judgment of sentence affirmed.

Judge Dubow joins in this memorandum. Judge Platt concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/9/2017