J-S13014-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JARED THRONE, | |
| Appellant | No. 1925 EDA 2016 |

Appeal from the Judgment of Sentence Entered May 24, 2015
In the Court of Common Pleas of Bucks County
Criminal Division at No(s): CP-09-CR-0001483-2016

BEFORE:  BENDER, P.J.E., LAZARUS, J., and FITZGERALD, J.[*]

MEMORANDUM BY BENDER, P.J.E.:                    **FILED APRIL 17, 2017**

Appellant, Jared Throne, appeals from the judgment of sentence of one year probation, imposed after he was convicted of single counts of terroristic threats, 18 Pa.C.S. § 2709(a)(1), disorderly conduct, 18 Pa.C.S. § 5503(a)(1), and harassment, 18 Pa.C.S. § 2709(a)(1).  Appellant solely challenges the sufficiency of the evidence to sustain his conviction of terroristic threats.  After careful review, we affirm.

Appellant was arrested and charged with the above-stated offenses based on an altercation with Barry and Susan Epstein, during which Appellant made threatening remarks to the Epsteins.  Appellant proceeded to a non-jury trial on May 24, 2016, and at the close thereof, the court

_____

[*] Former Justice specially assigned to the Superior Court.

convicted him of the offenses listed, *supra*. That same day, Appellant was sentenced to a one-year period of probation. He filed a timely notice of appeal, and he also timely complied with the court's order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Herein, he raises the following, single issue for our review:

A. Was the evidence sufficient to support the conviction?

Appellant's Brief at 4.

To begin, we note our standard of review of a challenge to the sufficiency of the evidence:

> In reviewing a sufficiency of the evidence claim, we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense. *Commonwealth v. Moreno*, 14 A.3d 133 (Pa. Super. 2011). Additionally, we may not reweigh the evidence or substitute our own judgment for that of the fact finder. *Commonwealth v. Hartzell*, 988 A.2d 141 (Pa. Super. 2009). The evidence may be entirely circumstantial as long as it links the accused to the crime beyond a reasonable doubt. *Moreno, supra* at 136.

*Commonwealth v. Koch*, 39 A.3d 996, 1001 (Pa. Super. 2011).

Appellant challenges the sufficiency of the evidence to support his terroristic threats conviction. That offense is defined in the Crimes Code as follows:

> **(a) Offense defined.--**A person commits the crime of terroristic threats if the person communicates, either directly or indirectly, a threat to:
>
> > (1) commit any crime of violence with intent to terrorize another[.]

- 2 -

18 Pa.C.S. § 2706(a)(1). "The purpose of [section 2706] is to impose criminal liability on persons who make threats which seriously impair personal security or public convenience. It is not intended by this section to penalize mere spur-of-the-moment threats which result from anger." Comment to 18 Pa.C.S. § 2706. As this Court has stated, "the real issue [i]s whether the Commonwealth presented sufficient evidence to establish the required *mens rea*, not whether the defendant made the statements in the context of a heated discussion. Being angry does not render a person incapable of forming the intent to terrorize." ***Commonwealth v. Walker***, 836 A.2d 999, 1001 (Pa. Super. 2003) (internal quotation marks and citation omitted).

In this case, the trial court summarized the evidence presented by the Commonwealth at Appellant's trial, as follows:

> Victims Barry Epstein, and his wife, Susan Epstein, were at the [Hong Kong Pearl] restaurant having dinner [on November 8, 2015 at approximately 6:00 p.m.]. [Appellant] and his family were also at the restaurant. Mr. Epstein testified that after [Appellant's] family left the restaurant, [Appellant] approached the Epsteins' table and asked them, "Do you know who I am?" [Appellant] stated, "My name is Jared Throne and because of your f---ing dy-- daughter, I spent time in jail and it cost me $10,000." [Appellant] repeatedly stated, "I'm going to f--- you up." [Appellant] told the victims, "I have an AK-47. I am going to get you people." [Appellant] was then removed from the restaurant by members of his family. Mr. Epstein called 911.

> Officer William Gredone of the Middletown Township Police Department responded to the scene. With regard to his interview of Mr. and Mrs. Epstein, Officer Gredone testified,

>> Mr. Epstein and his wife were visibly upset and shaken. They said that an incident had just occurred at the

restaurant with a known subject, who[se family] they have had trouble with … in the past. Mr. Throne, who is seated next to [defense counsel], had approached them and basically told them multiple times that he was going to f--- them up. They said it came out of nowhere. It just happened. And before he left, … Mr. Throne had threatened that he had an AK-47 and he was going to come f--- them up.

[Appellant], having left the scene, was initially interviewed [by police] by telephone. During that interview, [Appellant] indicated to the police that he was provoked. [Appellant] told police that Mr. Epstein repeatedly gave his family dirty looks during the entire time they were having dinner. He stated that when he walked by the Epstein[s'] table, Mr. Epstein called him a "b----" and that he and Mr. Epstein then got into a verbal confrontation. [Appellant] was asked what statements he made to Mr. Epstein. He told police that he just told Mr. Epstein to leave his family alone. He did not tell police that he threatened the victims with a gun.

The recording obtained from the restaurant's surveillance system corroborated Mr. Epstein's account. The recording depicts [Appellant's] approaching the victim[s'] table, addressing Mr. and Mrs. Epstein and being physically escorted from the property by his family. While most of the verbal exchange is inaudible due to the background noise in the restaurant, [Appellant] can clearly be heard using the word[s] "snitch" and "AK-47."

Mr. Epstein's account was also corroborated by [an] independent witness, Eric Blaustein, who was at the restaurant dining with his wife and his parents. Mr. Blaustein testified that he heard [Appellant] say, "I will f--- you up" in a loud and threatening voice. Mr. Blaustein testified that, when [Appellant] reached the vestibule of the restaurant, [Appellant] yelled, "I know where you live. I am going to f--- you up."

After he was advised that there was an eyewitness and surveillance footage from the restaurant that contradicted his initial account, [Appellant] gave a different version of the events. [Appellant] provided the police with the following[, verbatim (aside from the omission of vulgar language)] account in a hand-written statement:

My family and I were at Hong Kong Pearl. We were finishing up dinner. As we were there, my sister had told me the Epsteins were there. It bothered me because I knew them my whole life, but eight years ago their daughter lied to Bensalem Police and had me arrested and it ruined my life since. I received my degree, but can't get a job with a background. I decided not to say anything. As we were leaving, I went to the bathroom and came out. As I was walking out, I passed their table where he then -- what I heard was [b----]. This has been going on with him and my family for some time now. I replied to him saying, do you know who I am? And I said, I am Jared Throne. Your daughter ruined my life eight years ago and you are going to start with me because you own a gun. Which only reason I know is that is because my parents were friends for a while when I was young from 4 through 13. Then he just kept proceeding with cocky replies, which I knew he wanted to get under my skin, which I was not going to let happen. I just said to him, do you know your daughter is a drug addict, only because I ran into her a few times and she was out there. Then he stood up, got into my face when I was going to walk away. My whole family was there, my nephew, who is 11 who I coach. I wouldn't let him see that. But as he stood up he kept saying, I am going to get you locked back up. He kept saying it and saying it. And then he said to my dad, George, get your son. I am going to get him locked up or I am going to shoot him. I replied, I wish I had an AK to shoot you, which was so stupid to say, stoop down to his level and gave him what he wanted. I went home with my family and watched the Eagles. I never really thought he was going to get me locked up.

At trial, [Appellant] admitted that he blames the Epsteins' daughter for his 2009 possession with intent to deliver conviction because he believes that she provided information about his drug activity to the police. He testified that, as can be heard in the video, he did say the word "snitch," but claimed he was referring to Mr. Epstein because he was threatening to call the police. He referred to an "AK-47" but denied threatening to "f--- up" the victims.

Trial Court Opinion (TCO), 8/11/16, at 1-4 (footnotes containing citations to the record omitted).

On appeal, Appellant contends that the evidence failed to establish that he had the requisite intent to terrorize Mr. and Mrs. Epstein. Rather, Appellant avers that,

> his statements that "I'm going to fuck you up, I have an AK-47. I'm going to get you people," were spur-of-the-moment threats resulting from transitory anger. They were prompted by an incident occurring in 2008, wherein the Epsteins' daughter implicated Appellant in a drug delivery. There had been no contact between [Appellant] and that witness for the past eight years.

Appellant's Brief at 14. Appellant further argues that, considering the circumstances surrounding his threats to the Epsteins, it is apparent that he did not have a "settled purpose" to terrorize them, nor any intent to actually carry out those threats. *Id.* Instead, Appellant stresses that he merely "said things without meaning them" in a moment of anger. *Id.* at 16 (internal quotation marks omitted).

In rejecting Appellant's argument, the trial court reasoned:

> [Appellant] asserts that the Commonwealth failed to prove that he intended to terrorize Mr. Epstein, his wife or his daughter. At trial, [Appellant] relied on ***Commonwealth v. Kidd***, 442 A.2d 826, 827 (Pa. Super. 1982). In ***Kidd***, the defendant, who had been taken into custody for public drunkenness, repeatedly shouted obscenities and generally caused a disturbance while being treated in the emergency room of a hospital. It was in that context that the defendant threatened to kill police. The [C]ourt held that there was insufficient evidence to establish that the defendant intended to place police officers in a state of fear in view of the defendant's obvious state of inebriation and agitation. This case did not

- 6 -

involve the type of drunken hyperbole addressed in *Kidd*. Here, the evidence established that [Appellant] harbored a deep-seated resentment of the Epstein family, blaming Mr. and Mrs. Epstein's daughter for his arrest, conviction and incarceration years before. In retaliation for conduct [Appellant] described as having "ruined [his] life," [Appellant] initiated this confrontation with the intent to cause emotional harm to the family that he perceived [had] harmed him. Based on that evidence, this [c]ourt found that [Appellant's] statements were a measured response to a wrong he perceived had been committed against him and that they were not the product of mere "transitory anger" in the face of an immediate and emotionally stressful event. The fact that [Appellant] was angry at the time he initiated this confrontation does not preclude a finding of an intent to terrorize. … *Walker*, 836 A.2d [at] 1001 … (citing *Commonwealth v. Fenton*, 750 A.2d 863, 865 (Pa.[]Super.[]2000)). It was anger and resentment that motivated him to threaten the Epstein family. Finally, [Appellant's] testimony established that he intended to threaten the Epsteins. [Appellant] testified, "I figured if someone is threatening me[,] … I threaten them." Under these circumstances, this [c]ourt properly found that the element of intent had been proven beyond a reasonable doubt.

TCO at 6-7 (footnotes and citations to the record omitted).[1]

---

[1] We have omitted from our recitation of the trial court's analysis one footnoted comment, in which the court states:

> [Appellant's] reliance on the concept of transitory anger is further undermined by the fact that he testified that he was not angry when he made the statements. N.T. pp. 79-80.

TCO at 7 n.19. In the portion of the record cited by the court, Appellant was discussing his initial question to the Epsteins of whether they knew who he was. *See* N.T. Trial, 5/26/16, at 79. After that testimony, the court asked Appellant, "And you were already angry *at this point*?" *Id.* (emphasis added). Appellant replied, "No, not at all." *Id.* The court followed that response by asking, "Weren't you bothered at the table?" *Id.* Appellant answered, "No. No. No, not at all." *Id.* at 79-80. This testimony was about Appellant's emotional state prior to, and at the start of, his interaction with the Epsteins; thus, it does not support the court's conclusion that Appellant

*(Footnote Continued Next Page)*

The trial court's reasoning is sound. In particular, we agree with the court that Appellant's case is distinguishable from **Kidd**. Appellant was not inebriated, or as out of control, as was Kidd when the threats were made. Additionally, Appellant held a personal grudge against the Epsteins, whereas Kidd threatened random police officers. Appellant's long-held resentment of the Epstein family supports a conclusion that his threatening remarks to them were made with the intent to terrorize them, as Appellant believed that the Epstein's daughter had 'ruined his life.' Thus, we agree with the trial court that the totality of the circumstances in this case demonstrates that Appellant had the requisite *mens rea* to support his terroristic threats conviction. **See Commonwealth v. Reynolds**, 835 A.2d 720, 730 (Pa. Super. 2003) (stating that, "[t]his Court must consider the totality of [the] circumstances to determine whether the threat was a result of a heated verbal exchange or confrontation" so as to negate the intent element of terroristic threats) (citation omitted).

We also note that this case is distinguishable from the two other cases on which Appellant relies. First, Appellant's reliance on **Commonwealth v. Anneski**, 525 A.2d 373 (Pa. Super. 1987), is misplaced, as in that case, we reversed Anneski's conviction on **weight-of-the-evidence** grounds, and

_____
(Footnote Continued)

admitted "that he was not angry **when he made the statements**[,]" which came at the end of Appellant's encounter with the Epsteins. TCO at 7 n.19 (emphasis added).

indicated that the evidence was in fact **sufficient** to sustain Anneski's conviction. **See Anneski**, 525 A.2d at 375-76. Here, Appellant did not preserve below, and does not assert herein, a challenge to the weight of the evidence. Accordingly, our analysis in **Anneski** is irrelevant to the case at hand.

Additionally, Appellant's reliance on **Commonwealth v. Sullivan**, 409 A.2d 888 (Pa. Super. 1988), is unconvincing. There, Sullivan was convicted of two counts of terroristic threats. The first count was based on Sullivan's calling a state police barracks and telling the trooper who answered the phone that he would kill the local sheriff. **Id.** at 888. The trooper testified that Sullivan "had been 'very angry and not rational' during the … call…." **Id.** at 888-89. Sullivan's second terroristic threats count was based on the fact that, the morning after Sullivan had called the barracks, he had a chance encounter with the local sheriff and, during "[a] loud shouting match…," Sullivan had "again threatened to kill the [s]heriff." **Id.** at 889. In deeming the evidence insufficient to sustain either of Sullivan's terroristic threats convictions, we stated:

> The evidence shows that [Sullivan] uttered the telephone threat in what was, to say the least, an agitated and angry state of mind. There is no evidence to show that [Sullivan] had any intention of carrying out the threat. [Sullivan's] second threat was the emotional product of a chance meeting with the [s]heriff the following morning which had quickly become what both men described as a "mouth battle." There is likewise no evidence that this threat was made with any intention of carrying it out.

**Id.** at 889.

Here, unlike Sullivan's emotional state when he called the police barracks, there was no evidence presented at Appellant's trial that suggested he was **irrationally** angry. We reiterate that simply being angry at the time a threat is made does not automatically dispel an intent to terrorize. **Walker**, 836 A.2d at 1001.

Additionally, we are unconvinced by Appellant's argument that, like in **Sullivan**, his encounter with the Epsteins should be considered a "chance meeting in a restaurant." Appellant's Brief at 13. While it is true that it was by mere chance that Appellant was eating dinner at the same restaurant as the Epsteins, Appellant planned the actual **confrontation** with the Epsteins. Specifically, Appellant chose to walk directly by their table as he left the restaurant, and as he did so, he stopped, turned around, and asked if they knew who he was. Appellant then began barraging them with threats to 'fuck them up.'

Moreover, unlike the mutual 'shouting match' between Sullivan and the sheriff, the trial court here found credible Mr. Epstein's account of the incident, in which he described Appellant as making "one threat after the other[,] after the other[,] many times saying, [`]I am going to fuck you up and I have an AK-47.[']" N.T. Trial at 12. Mr. Epstein claimed that it was only after Appellant began threatening him that he stood up and asked that Appellant's father remove Appellant from the restaurant before they "have a problem." **Id.** at 13. Therefore, unlike in **Sullivan**, Appellant's threats to

the Epsteins were made during an incident solely provoked by Appellant, and during which Appellant was the only aggressive participant.

Consequently, we conclude that the evidence was sufficient to demonstrate that Appellant threatened the Epsteins with the intent to terrorize them, based in large part on his long-standing resentment of the Epstein family. Accordingly, his conviction of terroristic threats is supported by adequate evidence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/17/2017